LITTLE ROCK SCHOOL
DISTRICT, Appellee,

v.

PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1; Mac Faulkner; Charles Stratton; Don Hindman; Mack McAllister; Sheryl Dunn; David Sain; and Mildred Tatum, Appellants.

Lorene Joshua, as next friend of minors Leslie Joshua, Stacy Joshua and Mayne Joshua; Rev. Robert Willingham, as next friend of minor Tonya Willingham; Sara Matthews, as next friend of Khayyan Davis, Alexa Armstrong and Karlos Armstrong; Mrs. Alvin Hudson as next friend of Tatia Hudson; Mrs. Hilton Taylor as next friend of Parsha Taylor, Hilton Taylor, Jr. and Brian Taylor; Rev. John M. Miles as next friend of Janice Miles and Derrick Miles; Rev. Robert Willingham on behalf of and as President of the Little Rock Branch of NAACIP; Lorene Joshua on behalf of and as President of the North Little Rock Branch of the NAACIP; Katherine Knight, individually and as President of the Little Rock Classroom Teachers Association (LRCTA); LRCTA; Ed Bullington, individually and as President of the Pulaski Association of Classroom Teachers (PACT); PACT; John Harrison, individually and as President of the North Little Rock Classroom Teachers Association (NLRCTA); NLRCTA; Milton Jackson, individually and as a Noncertified Educational Support Employee of the Little Rock School District, Appellees.

LITTLE ROCK SCHOOL
DISTRICT, Appellee,

v.

NORTH LITTLE ROCK SCHOOL DISTRICT; Murry Witcher; Ginny Jones; Vicki Stephens; Leon Barnes; Marianne Gossner; and Steve Morley, Appellants.

Lorene Joshua, as next friend of minors Leslie Joshua, Stacy Joshua and Mayne Joshua; Rev. Robert Willingham, as next friend of minor Tonya Willingham; Sara Matthews, as next friend of Khayyan Davis, Alexa Armstrong and Karlos Armstrong; Mrs. Alvin Hudson as next friend of Tatia Hudson; Mrs. Hilton Taylor as next friend of Parsha Taylor, Hilton Taylor, Jr. and Brian Taylor; Rev. John M. Miles as next friend of Janice Miles and Derrick Miles; Rev. Robert Willingham on behalf of and as President of the Little Rock Branch of NAACIP; Lorene Joshua on behalf of and as President of the North Little Rock Branch of the NAACIP; Katherine Knight, individually and as President of the Little Rock Classroom Teachers Association (LRCTA); LRCTA; Ed Bullington, individually and as President of the Pulaski Association of Classroom Teachers (PACT); PACT; John Harrison, individually and as President of the North Little Rock Classroom Teachers Association (NLRCTA); NLRCTA; Milton Jackson, individually and as a Noncertified Educational Support Employee of the Little Rock School District, Appellees.

LITTLE ROCK SCHOOL
DISTRICT, Appellee,

v.

ARKANSAS STATE BOARD OF EDUCATION; Wayne Hartsfield; Walter Turnbow; Harry A. Haines; Jim Dupree; Dr. Harry P. McDonald; Robert L. Newton; Alice L. Preston; Jeff Starling; Earle Love, Appellants.

Lorene Joshua, as next friend of minors Leslie Joshua, Stacy Joshua and Mayne Joshua; Rev. Robert Willingham, as next friend of minor Tonya Willingham; Sara Matthews, as next friend of Khayyan Davis, Alexa Armstrong and Karlos Armstrong; Mrs. Alvin Hudson as next friend of Tatia Hudson; Mrs. Hilton Taylor as next friend of Parsha Taylor, Hilton Taylor, Jr. and Brian Taylor; Rev. John M. Miles as next friend of Janice Miles and Derrick Miles; Rev. Robert Willingham on behalf of and as President of the Little Rock Branch of NAACIP; Lorene

Joshua on behalf of and as President of the North Little Rock Branch of the NAACIP; Katherine Knight, individually and as President of the Little Rock Classroom Teachers Association (LRCTA); LRCTA; Ed Bullington, individually and as President of the Pulaski Association of Classroom Teachers (PACT); PACT; John Harrison, individually and as President of the North Little Rock Classroom Teachers Association (NLRCTA); NLRCTA; Milton Jackson, individually and as a Noncertified Educational Support Employee of the Little Rock School District, Appellees.

Nos. 85–1078, 85–1079 and 85–1081.

United States Court of Appeals, Eighth Circuit.

Submitted April 29, 1985.

Decided Nov. 7, 1985.

John R. Gibson, Circuit Judge, concurred in part and dissented in part and filed an opinion in which Fagg, Circuit Judge, joined.

Bowman, Circuit Judge, concurred in part and dissented in part and filed an opinion.

Phil Neal, Chicago, Ill., for Pulaski County.

Phil Lyon, Little Rock, Ark., for North Little Rock School Dist.

Steve Clark, Atty. Gen., Little Rock, Ark., for Arkansas State Bd.

William Bradford Reynolds, Washington, D.C., for amicus Dept. of Justice.

Philip E. Kaplan, P.A. Hollingsworth, John M. Billheimer, Janet Pulliam, Little Rock, Ark., for Little Rock School Dist.

Theodore Shaw, New York City, for Joshua intervenors.

Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG and BOWMAN, Circuit Judges, En Banc.

HEANEY, Circuit Judge.

The United States District Court for the Eastern District of Arkansas, after trial, found that the defendants Pulaski County Special School District (PCSSD), the North Little Rock School District (NLRSD) and the Board of Education of the State of Arkansas (State Board) contributed to the continuing segregation of the Little Rock schools, and that an interdistrict remedy

was appropriate. The district court ordered consolidation of the three school districts, establishment of a uniform millage rate, elimination of discriminatory practices, and creation of magnet schools to enhance educational opportunities in the new district. It held that the State Board had remedial, financial and oversight responsibilities that would be detailed at a later date. The defendants appeal from the district court's order. In addition, the Joshua intervenors, representing black parents and students, filed a brief in support of the district court's judgment, and the United States filed an amicus curiae brief in general support of the appellants.

We hold that the district court's findings on liability are not clearly erroneous and that intra- and interdistrict relief is appropriate. We find, however, that the violations can be remedied by less intrusive measures than consolidation. These measures, most of which were suggested by the defendant school districts or the Joshua intervenors, include authorizing the district court to make limited adjustments, after a hearing, to the boundaries between Little Rock School District (LRSD) and PCSSD, correcting the segregative practices within each of the individual school districts, improving the quality of any remaining non-integrated schools in LRSD, providing compensatory and remedial programs for black children in all three school districts, authorizing the district court to establish, after a hearing, a limited number of magnet schools and programs open to all students in Pulaski County, and requiring the State Board to participate in funding the compensatory, remedial and quality education programs, in establishing and maintaining the magnet schools, and in monitoring plan progress. We remand to the district court for action consistent with this opinion.

## I. BACKGROUND AND PROCEDURAL HISTORY.

Pulaski County is the most heavily populated metropolitan area in Arkansas, encompassing three independent school districts: LRSD, NLRSD, and PCSSD. The LRSD covers fifty-three square miles and comprises about sixty percent of the City of Little Rock. Although the population of the City of Little Rock is approximately two-thirds white, in the 1983–84 school year, seventy percent of LRSD's 19,052 students were black. Along with NLRSD, LRSD is one of the oldest continuously operating school districts in Arkansas. The NLRSD covers twenty-six square miles and comprises nearly all of the City of North Little Rock. Its 1983–84 student population was 9,051 (36% black, 64% white). The PCSSD surrounds LRSD and NLRSD. Created in 1927 through the consolidation of thirty-eight rural independent school districts, it covers 755 square miles and contains the remainder of the county not included in the other two school districts. In 1983–84, it had 27,839 students (22% black, 78% white). Each of the three districts currently operates under a court-ordered desegregation decree, and none of the districts has achieved unitary status.

On November 30, 1982, LRSD filed this action against PCSSD, NLRSD, the State of Arkansas, and the State Board.[1] On April 13, 1983, the district court dismissed the claim against the State of Arkansas but refused to take similar action concerning the State Board, holding that the Board is a proper party in light of its general supervisory relationship with the individual school districts, and the allegations that it has carried out its duties in a manner which increased segregation in Little Rock. The district court concluded that the dismissal of the State of Arkansas had no practical effect on the disposition of the lawsuit. *Little Rock School District v. Pulaski*

---

**1.** LRSD also named as defendants the Pulaski County Board of Education and the individuals serving on each of the defendant boards of education. The Pulaski County Board of Education did not participate in this litigation. The district court states, however, that the County

Board has a remedial responsibility that has yet to be defined.

On September 29, 1983, the district court denied Little Rock's motion to add the Governor, State Treasurer and State Auditor as defendants.

*County Special School District,* 560 F.Supp. 876, 878 (E.D.Ark.1983). The district court separated the liability and remedy phases of the litigation and held liability hearings from January 3–13, 1984.

On April 13, 1984, the district court issued its decision on liability, finding that PCSSD and NLRSD had failed to establish unitary, integrated school districts and had committed unconstitutional and racially discriminatory acts which resulted in "significant and substantial interdistrict segregation." *Little Rock School District v. Pulaski County Special School District,* 584 F.Supp. 328, 351–53 (E.D.Ark.1984). It concluded that these two school districts had taken actions which had substantial interdistrict segregative effects on education in each of the school districts in the county, and that the districts had failed to redress these segregative effects which they had perpetuated for over a century. The district court also reiterated its holding that the State Board was a "necessary party who must be made subject to the Court's remedial order." 584 F.Supp. at 352–53. It concluded that the only long- or short-term solution to these interdistrict violations is consolidation, and it scheduled hearings to consider the precise means to accomplish that end.

The first remedial hearings took place from April 30 through May 5, 1984. Before these hearings were held, a group of black parents in Little Rock, the Joshua intervenors, sought unsuccessfully to intervene in the proceedings.[2] They appealed, and on May 23, 1984, this Court ordered the district court to allow them to intervene and directed it to hear evidence from them concerning remedial alternatives to consolidation. Meanwhile, the defendant school districts had also appealed from the district court's order finding interdistrict violations and ordering consolidation of the three school districts. On May 23, 1984, we dis-

missed that appeal as premature but suggested that the district court reopen the proceedings to permit PCSSD and NLRSD to advance remedial alternatives to consolidation. *Little Rock School District v. Joshua,* 738 F.2d 445 (8th Cir.1984) (order); *Little Rock School District v. Pulaski County Special School District,* 738 F.2d 445 (8th Cir.1984) (order).

The district court held further remedial hearings from July 30 through August 2, 1984, and heard evidence on alternative remedial plans submitted by PCSSD, NLRSD, and the Joshua intervenors.[3] On November 19, 1984, it issued its decision on the remedy, reaffirming its view that consolidation of the three school districts was necessary to remedy the constitutional violations. It also entered further findings concerning the State Board's liability and reaffirmed the State Board's remedial responsibilities. 597 F.Supp. at 1227–28. The district court subsequently denied motions by the defendants for reconsideration.

This appeal followed. The issues on appeal are: (1) whether the district court's findings of interdistrict violations are clearly erroneous; (2) whether the district court's remedy exceeds the scope of the constitutional violations; and (3) whether the proceedings before the district court deprived the State Board and PCSSD of due process.

## II. THE DISTRICT COURT'S FINDINGS OF INTERDISTRICT VIOLATIONS ARE NOT CLEARLY ERRONEOUS.

### A. Legal Background.

#### 1. *Legal Standards in Desegregation Cases.*

Thirty years ago, the Supreme Court decided in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954),

---

2. The district court had denied an earlier motion by Joshua to intervene on January 3, 1984.

3. The district court also heard from the McKnight intervenors, representing the teachers employed in the three districts. *Little Rock School District v. Pulaski County Special School*

*District,* 597 F.Supp. 1220, 1227 (E.D.Ark.1984); *see also Little Rock School District v. Pulaski County Special School District,* 738 F.2d 82, 85 (8th Cir.1984) (allowing intervention by teacher representatives).

that "in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal." *Id.* at 495, 74 S.Ct. at 692. Since *Brown,* the Supreme Court has affirmed the obligation of school authorities operating segregated schools "to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Raney v. Board of Education,* 391 U.S. 443, 446, 88 S.Ct. 1697, 1698, 20 L.Ed.2d 727 (1968); *Green v. County School Board,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968). Moreover, the Supreme Court has held that "[e]ach instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment." *Columbus Board of Education v. Penick,* 443 U.S. 449, 459, 99 S.Ct. 2941, 2947, 61 L.Ed.2d 666 (1979); *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 413–14, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977) (*Dayton II* ).

■ Before a court may impose an interdistrict desegregation remedy, it must find an interdistrict constitutional violation. In *Milliken I,* the Supreme Court explained this prerequisite:

> Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state *or* local school districts, or of a single school district have been a substantial cause of interdistrict segregation.

*Milliken v. Bradley,* 418 U.S. 717, 744–45, 94 S.Ct. 3112, 3127–28, 41 L.Ed.2d 1069 (1974) (Milliken I) (emphasis added). As with any fourteenth amendment violation, a discriminatory purpose must be shown. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976);

*Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Keyes v. School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). Although the discriminatory impact of state action does not in itself prove a constitutional violation, the "[a]dherence to a particular policy or practice, 'with full knowledge of the predictable effects of such adherence upon racial imbalance in a school system is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn.' " *Columbus Board of Education v. Penick,* 443 U.S. 449, 465, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979).

■ Although an evaluation of basic segregative effects is important in determining the scope of a violation and hence the permissible scope of the remedy, a reviewing court is not called upon to quantify the precise segregative effects of each individual act of discrimination. *Dayton Board of Education v. Brinkman,* 443 U.S. 527, 540, 99 S.Ct. 2971, 2980, 61 L.Ed.2d 720 (1979) (*Dayton II* ).

This Court has affirmed findings of interdistrict violations and has approved interdistrict desegregation remedies on several occasions. *See, e.g., Morrilton School District No. 32 v. United States,* 606 F.2d 222, 229 (8th Cir.1979); *United States v. State of Missouri,* 515 F.2d 1365, 1371 (8th Cir.1975); *Haney v. County Board of Education of Sevier County,* 429 F.2d 364 (8th Cir.1970). We have also required a state (that had been found to have committed intradistrict violations) to participate in an intradistrict remedy even though that remedy required the state to expend funds in school districts other than the violating district. *Liddell v. State of Missouri,* 731 F.2d 1294 (8th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984).

*2. Review of Factual Findings.*

We will not reverse the district court's factual findings with respect to liability unless we conclude that they are clearly

erroneous. Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer City*, — U.S. —, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Pullman-Standard v. Swint*, 456 U.S. 273, 287–90, 102 S.Ct. 1781, 1789–91, 72 L.Ed.2d 66 (1982); *Dayton II*, 443 U.S. at 534 n. 8, 99 S.Ct. at 2977 n. 8; *Columbus Board of Education v. Penick*, 443 U.S. at 468–71, 99 S.Ct. at 2952, 2983 (concurring opinions of Burger, C.J., and Stewart, J.); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). Nor will we reverse such findings when they are based on inferences from other facts unless the rigorous standards of the same rule are met. *Anderson*, 105 S.Ct. at 1511. The Supreme Court has emphasized the importance of the clearly erroneous rule in civil rights cases, *see, e.g., Pullman-Standard v. Swint*, 456 U.S. at 287–90, 102 S.Ct. at 1789–91, and,

more particularly, in school desegregation cases:

> The elimination of the more conspicuous forms of governmentally ordained racial segregation * * * counsels undiminished deference to the factual adjudications of the federal trial judges in cases such as these, uniquely situated as those judges are to appraise the societal forces at work in the communities where they sit.

*Columbus*, 443 U.S. at 470, 99 S.Ct. at 2983 (Justice Stewart, with whom Chief Justice Burger joins, concurring).

## B. The State's Role in the Segregation of the Three Pulaski County School Districts.

The district court detailed the history of state-imposed segregation in the public schools in the State of Arkansas and the steps taken by the state[4] to perpetuate a

---

**4.** In finding that the State Board of Education was the proper agency through which the state was responsible in creating and failing to disestablish the dual school systems in Pulaski County, the district court noted:

> The State Board of Education has, by statute, general supervision over all public schools in the State of Arkansas. Ark.Stat. Ann. § 80–113. In addition to that general responsibility, the State Board and the Department of Education have numerous specific duties, including the approval of plans and expenditures of public school funds for new school buildings (Ark.Stat.Ann. §§ 80–113, 80–3506; T. 775); review, approval and disapproval of local school district budgets (Ark. Stat.Ann. §§ 80–113, 80–1305; T. 773); administration of all federal funds for education (Ark.Stat.Ann. §§ 80–123, 80–140); disbursement of State Transportation Aid Funds to local school districts (Ark.Stat.Ann. §§ 80–735, 80–736); *assisting school districts in the operation of their transportation system (T. 774); lending funds from the State Revolving Loan Fund to local school districts (Ark.Stat. Ann. § 80–942); approval or disapproval of bonds issued by local school districts (Ark.Stat. Ann. § 80–1105; T. 775); advising school districts regarding the issuance of bonds (T. 777); and regulation of the operation of school buses (Ark.Stat.Ann. §§ 80–1809, 80–1809.2).*

> The State Board of Education has broad statutory authority to supervise the public schools of the state generally, and to take what action it may deem necessary to "promote the physical welfare of school children and promote the organization and increase

the efficiency of the public schools of the State." Ark.Stat.Ann. § 80–113.

> The State Board of Education has the authority to promulgate regulations concerning the earmarking and use of funds used by local school districts (Ark.Stat.Ann. § 80–1305), the use of federal education funds by local school districts (Ark.Stat.Ann. § 80–142) for the administration of State Transportation Aid Funds by local school districts (Ark.Stat.Ann. § 80–735), and for the operation of school buses by local districts (Ark.Stat.Ann. §§ 80–1809, 80–1810).

> The State Board of Education may lend funds from the State Revolving Loan Fund for the purchase of school buses and other equipment, for making major repairs and constructing additions to school buildings, for the purchase of sites for new school buildings, for the construction of new school buildings, and for the purchase of surplus buildings. Ark.Stat.Ann. § 80–942.

597 F.Supp. at 1227–28 (emphasis included). The State Board does not contest these findings. Rather, it argues: first, that the district court's decision imposes financial burdens on the Board without finding that such expenditures are required to redress the effects of the Board's constitutional violations; second, that the Board was denied procedural due process by the district court; third, that the district court's findings failed to establish any causal relationship between violations found and the conditions to be remedied; and fourth, the district court's remedial order exceeds the limits necessary to correct the effects of the violations. In any event, we find no error in the district court's

dual school system, particularly in LRSD. The court pointed out that, despite the state's role in mandating and maintaining the dual system until the mid-1960's, the state had done nothing to assist in dismantling the dual system. The court further found that the state's acts had an interdistrict segregative effect with respect to the three school districts in Pulaski County. These findings are not clearly erroneous.

The state's role in the segregation of the public schools of Arkansas began in 1867 when the legislature enacted a law requiring separate public schools for blacks. Act of Feb. 6, 1867, No. 35, § 5, 1866–1867 Ark. Acts 98, 100. In 1931, this legislation was superseded by a law which required the board of school directors in each district of the state to "establish separate schools for white and colored persons." Ark.Stat.Ann. § 80–509(c) (Repl.1980). This statute was repealed on November 1, 1983.

Even though the United States Constitution required that the black and white public schools be equal, *Cumming v. Richmond County Board of Education,* 175 U.S. 528, 20 S.Ct. 197, 44 L.Ed. 262 (1899); *see also Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), black public schools in Arkansas were inferior to white schools. What was true throughout the state was true for NLRSD and PCSSD. Expenditures per pupil for black children in elementary schools in these districts were substantially less than they were for white children, the salaries of black teachers in the black schools were substantially lower than they were for the white teachers in the white schools, and the illiteracy rate of black children was substantially higher than that of white children. Of particular importance in this case, the black elementary schools in these two districts were infe-

rior to the black elementary schools in LRSD. 584 F.Supp. at 330.

The disparities at the high school level were even more pronounced than at the elementary level. Historically, LRSD maintained a high school for black students that was fully accredited by the North Central Association. *Id.* As late as the mid-1950's, however, no similar facility was maintained by PCSSD. *Id.* PCSSD paid the tuition and transportation costs for numerous black students who traveled from PCSSD to attend school in LRSD. 584 F.Supp. at 330. The district court credited several studies and the testimony of several witnesses to the effect that LRSD was identified as the school district in the state which provided educational opportunities for black students. *Id.* This identification tended to draw black students to LRSD from all over the state, and particularly from Pulaski County.[5] The state was fully aware of these disparities. Indeed, it had commissioned studies documenting that the disparities existed, and that the disparities were prominent among the factors that drew black families to Little Rock from the county and the rest of the state.

It cannot be seriously denied that the Little Rock School District's maintenance of the only North Central accredited black high school in the County and indeed in the entire area led to a concentration of blacks in this district. For almost half a century it has not only assumed the burden of giving a quality education to blacks in the County and from far corners of the State but has also been the object of racially motivated attacks by certain political and cultural groups. 584 F.Supp. at 330.[6]

In 1953, when the Granite Mountain housing project for blacks was being

imposition of remedial responsibilities on the state through the State Board. *See Evans v. Buchanan,* 393 F.Supp. 428 (D.C.Del.) (three-judge panel), *aff'd,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975).

**5.** Other factors encouraging migration of blacks to LRSD were jobs and public housing. 584 F.Supp. at 345. As pointed out elsewhere in this

opinion, no public housing has been constructed in PCSSD, and housing and credit restrictions prevented blacks from buying or renting housing in much of that district.

**6.** LRSD introduced into evidence a study which made the following conclusion:

In sum, black students from Pulaski County crossed the district boundary to attend senior

planned, the state, at the behest of the affected school districts, enacted legislation authorizing the transfer of the project site from PCSSD to LRSD. This action insured that a major black housing project would be built in LRSD, and that LRSD would continue to be recognized as the school district in Pulaski County which educated black children. This housing project is discussed more fully *infra*.

Notwithstanding the state's awareness of the educational disparities between LRSD and the other school districts in the state, it took no remedial action to require adequate educational opportunities for blacks in school districts other than LRSD.[7] In summarizing the pre-*Brown* history of school segregation in Pulaski County, the district court found that, historically, "[a]s far as the education of blacks was concerned, school district boundaries in Pulaski County were ignored." 584 F.Supp. at 330.

Even after the Supreme Court's decisions in *Brown I* and *Brown II*, the State of Arkansas took no steps to dismantle the segregated school system in Arkansas or to improve the quality of the black schools in the state generally or in the defendant school districts in particular. To the contrary, it took a series of actions which delayed the elimination of the dual school

system in the state for years. These actions were primarily directed against LRSD and heightened the identity of that district as the "black" district of Pulaski County.

On May 20, 1954, three days after *Brown I*, the Board of Education announced that "[i]t is our responsibility to comply with federal constitutional requirements and we intend to do so when the Supreme Court of the United States outlines the method to be followed." *Cooper v. Aaron*, 358 U.S. 1, 8, 78 S.Ct. 1401, 1404, 3 L.Ed.2d 5 (1958). By the spring of 1955, the Little Rock Board of Education had adopted a plan which would have desegregated the schools by 1963. *Id.* A large majority of the citizens of Little Rock agreed that the plan was "the best for the interests of all pupils in the District." *Id.* The plan was approved by the federal district court, *Aaron v. Cooper*, 143 F.Supp. 855 (E.D.Ark.1956), and this Court, *Aaron v. Cooper*, 243 F.2d 361 (8th Cir.1957), and review was not sought in the Supreme Court.

Meanwhile, the state intervened to prevent desegregation of the Little Rock schools. In November, 1956, Arkansas's voters adopted three initiatives sponsored by the state's political leadership. These included:

---

high in Little Rock from the 1920s to the 1960s. They probably became numerous in the early 1930s when Paul Laurance Dunbar High School acted as a magnet for county students who had little opportunity to attend senior high in their own district. At some point, the two districts worked out a tuition agreement under which Pulaski County paid for the use of Little Rock facilities by individual students. This led to a "county" designation on student record cards, the incidence of which shows that a substantial number of county students were enrolled at Dunbar in the 1940s and 1950s. Students from the county continued to attend Little Rock into the 1960s, but their numbers decreased as the county began to provide more and better senior high schools.
Joint Designated Record (J.D.R.) at 915–21.
This movement of blacks into LRSD, which the district court found to be "consistently understated" as shown in PX 36, 584 F.Supp. at 346, is reflected in general population statistics. From 1950 to 1980, the black population of the

City of Little Rock more than doubled, from approximately 23,000 to more than 51,000. During the same period, the white population of the City of Little Rock, excluding annexed territory, declined. If the annexed territory is included, the white population increased from 79,000 to 105,000. *See* BUREAU OF THE CENSUS, 1950 CENSUS OF POPULATION, CHARACTERISTICS OF THE POPULATION, vol. 11, part 4; BUREAU OF THE CENSUS, 1980 CENSUS OF POPULATION, CHARACTERISTICS OF THE POPULATION, vol. 1. For related population statistics, *see* note 5 *infra*.

7. Indeed, the State Board successfully argued in a federal district court case in 1949 that black students did not have the right to attend high school within their school districts and that "the interests of Negro education will be best promoted by the maintenance of a consolidated Negro high school serving several districts[.]" *Pitts v. Board of Trustees of DeWitt Special School District*, 84 F.Supp. 975, 987 (E.D.Ark. 1949).

1. An amendment to the state constitution directing the legislature to oppose *Brown* in every constitutional manner until such time as the federal government ceases from enforcing *Brown*, and providing that any employee of the state, or any of its subdivisions, who willfully refuses to carry out the mandates of this amendment shall automatically forfeit his office and be subject to prosecution under penal laws to be enacted by the legislature. Ark. Const.Amend. 44. Although this amendment remains on the books, it is recognized by the state authorities as being unconstitutional.

2. A resolution of interposition calling on all states and citizens to adopt a constitutional amendment prohibiting federal involvement in public education, and pledging resistance to school desegregation.

3. A pupil placement law, Ark.Stat. §§ 80–1519 to –1524, authorizing local boards of education or superintendents to transfer or reassign students or teachers among any schools within their districts, or to "adjoining districts whether in the same or different counties, and for transfer of school funds or other payments by one Board to another for or on account of such attendance." *Dove v. Parham*, 176 F.Supp. 242, 244 n. 4 (E.D. Ark.1959).

*See* 584 F.Supp. at 330–32.

In January, 1957, the state legislature enacted, and the Governor signed, legislation implementing the constitutional amendment, including legislation authorizing local school districts to spend school funds to defend integration litigation, and to relieve (or at least to delay) school children from compulsory attendance at racially mixed schools. Governor Orval Faubus also signed legislation creating a state sovereignty commission, with broad powers, to:

1. Perform any and all acts and things deemed necessary and proper to protect the sovereignty of the State of Arkansas, and her sister states from encroachment thereon by the Federal Government or any branch, department or agency thereof, and to resist the usurpation of the rights and powers reserved to this State or our sister states by the Federal Government.

2. Give such advice and provide such legal assistance as the Commission considers necessary or expedient, when requested in writing to do so by resolution adopted by the governing authority of any school district, upon matters, whether involving civil or criminal litigation or otherwise, relating to the commingling of races in the public schools of the State.

3. Study and collect information concerning economic, social and legal development constituting deliberate, palpable and dangerous invasions of or encroachments upon the rights and powers of the State reserved to the State under [the Tenth Amendment to the U.S. Constitution].

*See* 584 F.Supp. at 330–32.

The statute also required prointegration organizations to register and report to the state sovereignty commission. *See Aaron v. Cooper*, 163 F.Supp. 13, 15 (E.D.Ark. 1958).

Notwithstanding these actions, the Little Rock Board of Education took preliminary steps to admit nine black students to Central High School in the fall of 1957. Governor Faubus, however, barred the nine students from entering Central High School by ordering the Arkansas National Guard to stand at the schoolhouse door and to declare the school "off limits" to black students. President Eisenhower responded by dispatching federal troops to guarantee the admittance of the nine black students. They were admitted after the troops arrived and the troops remained in Little Rock for the rest of the school year. Subsequently, the federal district court enjoined Governor Faubus from using the Arkansas National Guard to obstruct or interfere with court orders, *Aaron v. Cooper*, 156 F.Supp. 220, 226–27 (E.D.Ark. 1957), and this Court affirmed, *Faubus v. United States*, 254 F.2d 797, 806–08 (8th Cir.1958).

In February, 1958, "because of extreme public hostility * * * engendered largely by the official attitudes and actions of the Governor and the Legislature," *Cooper v. Aaron*, 358 U.S. at 12, 78 S.Ct. at 1407, local officials petitioned the district court to postpone until at least 1961 "the plan of gradual racial integration in the Little Rock public schools" which the Little Rock Board of Education had adopted in 1955 for implementation at the high school level for the 1957–58 school year. *Aaron v. Cooper*, 163 F.Supp. 13, 14 (E.D.Ark.1958). The district court found that "between the spring and fall of 1957 there was a marked change in public attitude toward [the school desegregation] plan," that persons who had formerly been willing to accept it had changed their minds and had come to the conclusion "that the local School Board had not done all it could do to prevent integration." 163 F.Supp. at 21. The court noted that the state legislature's 1957–58 "enactments had their effect at Little Rock and throughout the State in stiffening opposition to the plan[.]" *Id.* Because of this state-fostered "opposition * * * to the principle of integration which * * * runs counter to the pattern of southern life which has existed for over three hundred years," *id.*, and the "corresponding damage to the educational program," *id.* at 26, and the City of Little Rock itself, the court held that a two-and-one-half-year moratorium on desegregation was necessary.

This Court reversed, *Aaron v. Cooper*, 257 F.2d 33, 40 (8th Cir.1958), and the Supreme Court affirmed our decision on September 12, 1958, quoting with approval a pleading filed by the school board:

> The legislative, executive, and judicial departments of the state government opposed the desegregation of Little Rock schools by enacting laws, calling out troops, making statements vilifying federal law and federal courts, and failing to utilize state law enforcement agencies and judicial processes to maintain public peace.

*Aaron v. Cooper*, 358 U.S. 1, 15, 78 S.Ct. at 1408 (1958).

While the above appeal was pending, opponents of desegregation secured a state court injunction to prevent the opening of the "partially integrated high schools" of Little Rock. Once again, the federal district court set aside the injunction and this Court affirmed. *See Thomason v. Cooper*, 254 F.2d 808 (8th Cir.1958).

In August, 1958, Governor Faubus called an "emergency session" of the legislature, which enacted three laws aimed at preventing the Little Rock Board of Education from complying with *Brown*. Act 4 authorized the Governor, by proclamation, to close any or all public schools within any school district pending a referendum "for" or "against" the "racial integration of all schools within the school district;" Act 6 permitted students to transfer to segregated public or private schools across district lines if the schools they ordinarily attended were to be desegregated; and Act 9 authorized the removal by recall of any members of local school district boards. (This Act was aimed at removing from the Little Rock Board of Education those who favored desegregation.)

On September 13, 1958, Governor Faubus issued a proclamation closing the four Little Rock high schools, white and black. They remained closed throughout the 1958–59 school year, with the school board leasing the schools to a private school corporation which intended to operate them on a segregated basis. The federal courts found that such operation would be unconstitutional and enjoined the private corporation from operating the schools, *see Aaron v. McKinley*, 173 F.Supp. 944, 952 (E.D. Ark.1959), *aff'd sub nom. Faubus v. Aaron*, 361 U.S. 197, 80 S.Ct. 291, 4 L.Ed.2d 237 (1959) (per curiam). Nevertheless, the Little Rock schools remained closed for the entire school year, and during this period, many white and some black students from Little Rock attended segregated schools in PCSSD. The Arkansas state legislature enacted a statute authorizing the state to pay for the interdistrict transfer of students from desegregated to segregated

public and private schools. Ark. Acts 1959 No. 236. *See* Ark. Acts, Special Session 1958, No. 6. In 1960, an independent study described the number of transfers among the three Pulaski County school districts to preserve segregation as "excessively high." 584 F.Supp. at 339. Significant numbers of interdistrict transfers continued until 1965. PX 10.

Shortly after the school closing act was declared unconstitutional, the Little Rock Board of Education announced that it would reopen the Little Rock high schools for the 1959–60 school year because "we will not abandon free public education in order to avoid desegregation." *Norwood v. Tucker*, 287 F.2d 798, 805 (8th Cir.1961). The Board also publicly announced, however, that it awaited advice from "Governor Faubus and his attorneys * * * [on] any method whereby we may maintain compulsory segregation and still operate our public high schools." *Id.*

During the 1959–60 school year, students were assigned to particular schools in accordance with the Arkansas pupil placement laws of 1956 and 1959. Ark.Stat. Ann. §§ 80–1519 through 1524. In *Parham v. Dove*, 271 F.2d 132 (8th Cir.1959), and *Dove v. Parham*, 282 F.2d 256 (8th Cir.1960), we held that the Arkansas pupil placement laws were not facially unconstitutional although we recognized that the laws could in practice be used to perpetuate segregated schools. 271 F.2d at 136.

In *Norwood v. Tucker*, 287 F.2d 798 (8th Cir.1961), we held that the Little Rock Board of Education was using "the standards and criteria * * * [of the Arkansas pupil placement laws] for the purpose of impeding, thwarting and frustrating integration." *Id.* at 808. We called the Board's attention to the continuing injunction in the first *Aaron* case requiring them to " 'take affirmative steps' * * * to facilitate and accomplish operation of the school district on a nondiscriminatory basis." *Id.* at 809.

Thereafter, the Little Rock Board of Education attempted to use the Arkansas pupil placement law in a nondiscriminatory fashion. However, in 1965, litigation was once again commenced alleging that black children were being denied admittance to predominantly white schools in Little Rock and "assigned to 'Negro' schools near their home." *Clark v. Board of Education of Little Rock School District*, 369 F.2d 661, 665 (8th Cir.1966).

On April 22, 1965, the Board formally abandoned use of the pupil assignment law and adopted a freedom-of-choice plan. When the litigants in the *Clark* case, *id.*, alleged that this freedom-of-choice plan failed to meet constitutional standards, the Little Rock School Board advanced "a number of desegregation plans * * * in a good faith effort to provide a solution to continuous litigation." *Little Rock School District v. Pulaski County Special School District*, 584 F.Supp. at 334. However, the Board "[u]ntil January 1967 * * * was faced with a hostile governor and state administration and an unfriendly legislature," *id.*, which helped stir up a "hysterical political atmosphere," *id.*, that led to the defeat of the several proposals for more effective school desegregation.

Little Rock continued to rely on a freedom-of-choice desegregation plan (as modified in *Clark*, 369 F.2d 661) until, by 1968, it became clear that this plan was generally ineffective and would not meet the constitutional standards which the Supreme Court had recently spelled out in *Green v. County School Board of New Kent County*, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968); *Raney v. Board of Education of Gould School District*, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); and *Monroe v. Board of Commissioners of City of Jackson*, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). We noted in *Clark v. Board of Education of Little Rock School District*, 426 U.S. 1035, 1043 (8th Cir.1970), that, despite considerable progress in desegregating several Little Rock schools, "[u]nder 'freedom of choice' in 1968–69 approximately 75% of the Negro students attended schools in which their race constituted 90% or more of the student body."

For the 1969–70 school year, the Little Rock Board of Education adopted a plan for pupil assignment based on geographic attendance zones. In *Clark, id.*, we held that this plan's program for student desegregation did not meet the constitutional requirement to eliminate racial discrimination "root and branch." *Id.* at 1041. We ordered the Little Rock Board of Education to file with the district court an effective desegregation plan for implementation no later than the 1970–71 school year.

■ Ultimately, it was not until the 1973–74 school year that most Little Rock schools were desegregated. *See* School Desegregation in Little Rock, U. S. Commission on Civil Rights 7 (June, 1977). Thus, although the Little Rock Board of Education had announced shortly after *Brown I* that it would begin to desegregate its schools by 1957 and complete the process by 1963, the active intervention of the state was a central factor in delaying desegregation of the Little Rock schools until 1973, and in contributing to the increasing concentration of blacks in LRSD.[8] The district court found that throughout this period and to this day, the state has never acknowledged its affirmative duty to assist local school districts in their desegregation efforts and has never promulgated any rules or guidelines which would encourage the local school districts to eliminate discrimination in their school systems. Nor has it taken action to foster racially neutral school siting. Rather, it has approved racially segregative school sitings in violation of district court decrees as recently as 1980. *Id.* It has fostered impressive programs to improve the quality of education generally, but has made no effort to improve the instruction of educationally deprived and discriminatorily served black students. 597 F.Supp. at 1228. It provides funds for transportation but does not provide specific funds to aid transportation for desegregation. 597 F.Supp. at 1228. It has also failed to seek all federal funds available to aid desegregation efforts. Since the 1950's, it has encouraged consolidation of school districts to promote efficiency and quality of education, but has taken no action to encourage consolidation to end the racial segregation which it required for over a century. 597 F.Supp. at 1228. To this day, the state takes the position that Arkansas law does not permit it to assist local school boards in their desegregation efforts. Brief of Appellant State Board at 6.

## C. The Pulaski County Special School District's Role in the Segregation of the Pulaski County School Districts.

The district court set forth in some detail the factors it considered significant to its

---

8. The district court's finding that specific discriminatory actions by the defendants had a substantial and continuing effect on the racial composition of LRSD is supported by general and school population statistics. From 1950 to 1960, the white population of the City of Little Rock declined significantly (if growth through annexation is excluded), while the white population of North Little Rock and the remainder of Pulaski County increased at an extraordinary rate. Including population gains through boundary expansions of the Cities of Little Rock (13,219 persons added by annexation) and North Little Rock (6,414 persons added by annexation), and corresponding population losses in the unincorporated areas of Pulaski County, the white population of the City of Little Rock increased by only 3,807 from 1950 to 1960 while the white population of North Little Rock increased by 11,526 and the white population of the remainder of Pulaski County increased by 13,266. These demographic data were generally contrary to statewide trends in Arkansas during the same period, and tend to support plaintiffs' theory that the state-created racial turmoil in LRSD in the 1950's fostered substantial white flight from LRSD to PCSSD and NLRSD. This trend continued throughout the 1960's and then accelerated during the 1970's. By 1980, the white population of PCSSD had increased to 123,000 from 50,000 in 1950. During the same period, PCSSD's black population increased by less than 10,000. *See* BUREAU OF THE CENSUS, 1950, 1960, 1970 and 1980 CENSUS OF THE POPULATION, CHARACTERISTICS OF THE POPULATION—ARKANSAS.

From 1956 to 1973, the black student population in LRSD increased from 3,481 to 10,274, an increase of over 87%. During the same time, the white student population of LRSD decreased from 16,242 to 11,951, a decrease of 25%. *See Aaron v. Cooper*, 143 F.Supp. 855, 860–61 (E.D. Ark.1956), and PCSSD exhibit 9.

holding that PCSSD had committed significant interdistrict violations. It further found that these violations are of a continuing nature and justify imposing an interdistrict remedy which would include PCSSD. These findings are not clearly erroneous.

PCSSD was created in 1927 pursuant to Act 152 of the 1927 Arkansas Acts, which gave the residents of Pulaski County outside of the cities of Little Rock and North Little Rock the right to organize a single school district. On July 21, 1927, a consolidated school district was approved by referendum. Pursuant to this referendum, the Pulaski County Board of Education ordered that "all of Pulaski County outside the territory embraced in the cities of Little Rock and North Little Rock be created and organized into a special school district to be named and known as Pulaski County Special School District." 584 F.Supp. at 340. "The historic intention [was] that the boundaries of the cities of Little Rock and North Little Rock remain coterminous with the respective school districts[.]" 584 F.Supp. at 340.

PCSSD maintained inadequate elementary schools for blacks and was without an accredited high school for blacks until 1955. 584 F.Supp. at 329–30. Accordingly, many black elementary students from the county and any black student from the county who wished to attend an accredited high school had no reasonable alternative other than to attend the black schools in Little Rock. 584 F.Supp. at 330 ("As far as the education of blacks were concerned, school dis-

trict boundaries in Pulaski County were ignored.") Pulaski County paid for many interdistrict transfers. Some black families moved from the county to Little Rock because of the disparities in educational opportunities. J.D.R. at 915–19; 584 F.Supp. at 330–40.

In 1953, PCSSD cooperated with LRSD and the state in a substantial interdistrict segregative act by permitting the annexation of lands for the construction of a black residential housing project, the Granite Mountain project, thus insuring that the black students in the project would attend school in LRSD rather than PCSSD, and enhancing LRSD's position as the school district with the responsibility of educating black children. This housing project is discussed in greater detail *infra*. When the state closed LRSD for the 1958–59 school year to avoid the desegregation of that school system, PCSSD accepted students from the Little Rock schools into the segregated schools of the county. These interdistrict transfers continued until the mid–1960's.

Until the late 1960's, LRSD generally grew as the City of Little Rock grew, and there is no contention that these annexations, with the significant exception of the Granite Mountain project, were intended to have a segregative effect.[9] In 1968, the Supreme Court announced that freedom-of-choice plans were failing to dismantle dual school systems and that "if it cannot be shown that such a plan will further rather than delay conversion to a unitary, nonra-

**9.** Cammack Village was annexed in 1948. The record does not reveal the number of students involved in this annexation and no party to this litigation attributes any discriminatory purpose to this annexation. J.D.R. 2104–06. Euclid Place was annexed in 1949. The record indicates that nineteen students were involved in this annexation. J.D.R. 2107. No party to this litigation attributes any discriminatory purpose to this annexation. Meadowcliff, Pleasant Valley and Brady were annexed in 1961. The record does not reveal the number of students involved and the parties attribute no discriminatory purpose to this transfer. J.D.R. 2108–50. Each of the annexations cited above came at a time when each Pulaski County school district was operating a dual school system. Walton

Heights was annexed in 1967. The number of students involved in the annexation is not disclosed in the record, but the annexation encompassed only .0058% of the value of the real property in PCSSD. J.D.R. 2169–85. Candlewood was annexed in 1968. It was a white residential area and apparently the annexation was not a significant one as it involved only .0016 of the assessed valuation of the County. J.D.R. 2186–2202, 655, 823. In addition to the five annexations outlined above, LRSD annexed a tract of uninhabited land in 1964 for use as a site for the Metropolitan Vocational School to be open to students from LRSD and PCSSD school districts. J.D.R. 2150–68, 651. T. at 1129.

cial, nondiscriminatory school system, it must be held unacceptable." *Monroe*, 391 U.S. at 459, 88 S.Ct. at 1705; *Raney*, 391 U.S. at 446, 88 S.Ct. at 1698; *Green*, 391 U.S. at 439, 88 S.Ct. at 1694. It required that segregation be eliminated root and branch. The black parents and children of LRSD took immediate action to secure compliance with these decisions. This Court complied with the Supreme Court mandate and required LRSD to implement a comprehensive plan to desegregate the schools of that district. *See Clark v. Board of Education of Little Rock School District*, 426 F.2d 1035 (8th Cir.1970), *cert. denied*, 402 U.S. 952, 91 S.Ct. 1608, 29 L.Ed.2d 122 (1971); *Clark v. Board of Education*, 449 F.2d 493 (8th Cir.1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 954, 30 L.Ed.2d 812 (1972), *aff'd*, 471 F.2d 656 (8th Cir.1972) (mem.). After the Supreme Court decided the *Green* trilogy, the concurrent annexation of lands by the City of Little Rock and LRSD ended and, from that point on, the city continued to expand, but the boundaries of LRSD remained relatively static. *Little Rock*, 584 F.Supp. at 340. The district court found that "Pulaski County Special School District's acts of freezing its boundaries to discontinue the practice of allowing City and Little Rock School District boundaries to remain coterminous springs from an unconstitutional racial motive that has significant interdistrict effects on the Little Rock School District." 584 F.Supp. at 341 (finding 26).[10]

As a result, by 1984, the City of Little Rock encompassed ninety-one square miles while LRSD covered only fifty-three square miles. Attractive industrial and residential areas in the county were made a part of the City of Little Rock but remained within PCSSD rather than becoming part of LRSD. These areas are residential sections in which many white families either lived or subsequently moved into and, as a result, their children now attend schools in PCSSD. If the boundaries of the City of Little Rock and its school district had remained coterminous, the black-white ratio in the Little Rock schools would now be sixty-forty rather than seventy-thirty.[11]

The district court found that the boundaries between PCSSD and LRSD had been maintained to keep LRSD predominantly black and PCSSD predominantly white. It further found that these boundary manipulations have had a substantial interdistrict segregative effect. 584 F.Supp. at 351. These findings are not clearly erroneous.[12] They were based on

10. The district court found that PCSSD was interested in consolidation until the early 1970's when LRSD adopted a comprehensive desegregation plan. (The latest expression of such interest came on May 14, 1968, when the PCSSD Board agreed to accept LRSD's request for a meeting of the two boards to consider consolidation. Records and Proceedings of PCSSD Board, May 14, 1968; 584 F.Supp. at 341 finding 22.) On May 13, 1970, this Court *en banc*, in an opinion by Judge M.C. Matthes, required LRSD to implement a comprehensive desegregation plan consistent with the *Green* trilogy, decided on May 27, 1968. *Green*, 391 U.S. at 439; 88 S.Ct. at 1694; *Raney*, 391 U.S. at 446; 88 S.Ct. at 1698; *Monroe*, 391 U.S. at 459, 88 S.Ct. at 1705. The district court finding that the PCSSD Board's change in attitude toward consolidation was, in part, racially motivated is not clearly erroneous.

11. Approximately 20,000 whites and 3,000 blacks live in the areas of the City of Little Rock which are now included in PCSSD. Ten schools located in this area serve approximately 3,000 white students and 300 black students who live within the city limits. Nearly 1,500 additional white students and 323 black students living in the city are bused to PCSSD schools located beyond the city limits.

12. The district court also found:

Because of the large numbers of formal and informal transfers of students among the districts and the abetting of the transfers by the districts, the cooperation among the districts and their personnel in other areas, the recurrent consideration of consolidation and the long-standing practices of annexations to the two city districts, the Court finds that the three school districts in Pulaski County were not historically separate and autonomous.
584 F.Supp. at 341.
Although we find substantial evidence in the record to support the district court's findings of extensive interdistrict cooperation in attempting to confine blacks to central Little Rock, we find that the court clearly erred in finding that the three Pulaski County school districts were not separate and autonomous. Among the factors that clearly indicate that the districts were his-

the facts recited herein and on the expert testimony of Dr. Robert Dentler who testified that the boundary lines had an interdistrict effect. He went on to state:

* * * The major consequence of the boundary lines established as they were in 1928 at the peak of consolidation efforts initiated by small rural districts of the County and with the support of the State, have by now come to a condition where they keep the Little Rock School District very predominately black and limit the opportunities therein of black students.

The boundaries also have generated consequences with respect to differences in State aid, State aid for instructional and related services generally and State aid for transportation. While the differences which have favored the County over the years have been remedied very recently there are all of the years in which the State aid formulas supported the County to the benefit of non-black higher proportions by far of non-black students and a disadvantage both to Little Rock School District and North Little Rock.

The boundaries also echo with refusals to modify them from within the Boards of Directors, at least since 1968. In other words, after years of conversation about the merits of the boundaries, about mutual assistance especially for purposes that have not to do with race, suddenly these boundaries harden and the Pulaski County Board refuses any further modification of them on the one side, and the Little Rock Board of Directors does not move or press on modifications so far as I can find.

The boundaries also signify to me that under them, under the circumstances of a suburban system what was rural, what once existed as 38 rural counties, now congealed into a modernizing suburban system is such that under these boundary conditions school construction fol-

lows real estate development, not educational needs.

T. at 379–80; T. at 69; 584 F.Supp. at 340–41.

During the first two decades of tumultuous desegregation in LRSD, PCSSD schools remained segregated and free from the problems which accompanied state-resisted desegregation in Little Rock. It was not until 1968 that suit was first brought to desegregate the PCSSD schools. *Zinnamon v. Board of Education of Pulaski County Special School District*, No. LR–68–C–154 (W.D.Ark.1971), slip op. at 1. This suit remained dormant until 1970, while the Department of Health, Education & Welfare negotiated with the PCSSD Board of Education to work out an integration plan. After extensive litigation which led to an order enjoining PCSSD's discriminatory school construction plans, PCSSD consented to the entry of a decree by Judge J. Smith Henley—then Chief Judge of the United States District Court for the Eastern District of Arkansas—integrating its schools. *Zinnamon v. Board of Education of Pulaski County Special School District*, No. LR–68–C–154 (W.D. Ark.1973). The district court found that PCSSD had failed to comply with the Henley decree and noted that, at trial, many PCSSD Board of Education members were not even aware of the contents of the decree. Some of the more significant violations found by the court were:

1. After 1973, PCSSD continued to close schools in black neighborhoods and to build new schools in distant suburbs that were the developing areas of white population. 584 F.Supp. at 346. Many of the new schools are over ninety percent white. *Id.* For example, Northwood Junior High School was opened in 1980 in a remote location far from a black residential area and has a student enrollment which is only eight percent black. North Pulaski was built in 1977, remote from any black residential areas in the furthest reaches of

torically separate school districts are that each district has always levied its own taxes, elected its own board of education, hired its own faculty and staff, and established its own salary schedule, operating rules and regulations.

Pulaski County, and in 1983, had a black student population of about six percent. Cato Elementary School was built in 1975, again in a remote area and, in 1983, it had a student population which was less than ten percent black. Robinson Middle School was built in 1981 and, in 1983, had a black student population of slightly over eleven percent. The district court credited the testimony of Dr. Robert Dentler, plaintiffs' expert witness, that "the county took pains not to site new schools where they would be accessible to blacks, and others they dusted off old dilapidated plants and arranged to have them as walk-in schools for black students well out of reach of possible transportation by white students." There has been no new construction in or near the central part of the county, or to the east or southeast, where blacks live. The district court concluded that there were substantial and continuing inter- and intradistrict effects from PCSSD's violation of *Zinnamon*'s specific order that PCSSD must cease and desist now and in the future from building schools in sites which are not equally accessible to blacks and whites. 584 F.Supp. at 346. All of these events are contrary to *Swann*'s admonition against the location of new schools "in the areas of white suburban expansion, farthest from Negro population centers." *Swann*, 402 U.S. 1, 20–21, 91 S.Ct. 126, 1278–79, 28 L.Ed.2d 554.

2. Student assignments continue to be made on a racially discriminatory basis. Thus, in 1983, of fifty-one schools in PCSSD, sixteen are racially identifiable as black schools and thirteen are racially identifiable as white schools. In some instances, neighboring schools are operated as racially identifiable schools. Thus, Mabelvale Junior High School is close to Cloverdale Junior High School (both are within the City of Little Rock but are part of PCSSD), but Mabelvale's enrollment in 1983 was only 12.7 percent black while the Cloverdale's enrollment was slightly more than thirty-three percent black. 584 F.Supp. at 354–55. PCSSD maintains racially identifiable black schools by not busing in white students and by busing in additional black students. 584 F.Supp. at 348. PCSSD buses black students to Wakefield, Watson, and Cloverdale schools even though these schools have some of the highest enrollments of blacks in PCSSD and are located a short busing distance from identifiably white schools. 584 F.Supp. at 348, 354–55. Racially identifiable white schools are maintained by not busing blacks to schools built in white neighborhoods. 584 F.Supp. at 348.

3. Similarly, PCSSD failed to apportion the burden of busing fairly among white and black students. Thus, a black student enrolled in the PCSSD system is two and one-half times more likely to be bused for desegregative purposes than a white student, 584 F.Supp. at 348, and a disproportionate number of black students in PCSSD are bused long distances, often to schools which are already racially identifiable as black. *Id.*

4. PCSSD cooperated with the City of Little Rock in the location and building of Fair and Otter Creek Schools in white neighborhoods within the city limits but just outside the boundaries of LRSD. 584 F.Supp. at 346. Both schools are racially identifiable as white schools. Fair High School, which has a thirteen percent black enrollment, is located less than two miles from LRSD's Parkview High School which has a fifty-six percent black enrollment, and is a reasonable busing distance from PCSSD's Mills High School which has an enrollment of over forty percent black. 584 F.Supp. at 356. Otter Creek has a black enrollment of only fourteen percent, but is located near several PCSSD and LRSD elementary schools with significantly higher black enrollments.

5. PCSSD failed to meet the goals for the hiring and promotion of black principals, teachers and administrators. 584 F.Supp. at 347–48. Accordingly, there are fewer employment and promotion opportunities for blacks in PCSSD and the absence of black role models in teaching and administration. *Id.* These factors have discouraged the growth of a black community in PCSSD. 584 F.Supp. at 347.

6. The chances that a black student will be classified as educably mentally retarded are significantly greater in PCSSD than they are in LRSD. 584 F.Supp. at 350.

7. Unlike LRSD, PCSSD has failed to develop programs to encourage the participation of black students in curricular and extracurricular activities. 584 F.Supp. at 348.

8. PCSSD has failed to comply with requirements that a biracial committee be established and that two black citizens, elected and selected by the black community, serve in ex-officio capacity on its Board of Education. 584 F.Supp. at 347. This failure reduced the input of the PCSSD black community on school site selection and housing project decisions and exacerbated the historical trend of black in-migration to LRSD and white out-migration to PCSSD.

### D. North Little Rock's Role in Segregating the Three Districts.

■ The district court found that NLRSD had committed several significant interdistrict violations. Our review of the record convinces us that the trial court's findings with respect to the violations listed below are not clearly erroneous, and that the current interdistrict impact of these violations justifies an interdistrict remedy which would involve NLRSD. We do, however, take the nature and extent of NLRSD violations into consideration in framing a remedy (which is largely intradistrict with respect to that district).

In the pre-*Brown* period, NLRSD failed to maintain equal or adequate schools for black students, particularly at the high school level. This failure led to significant transfers of black high school students from NLRSD to LRSD, and contributed to the concentration of blacks in LRSD, 584 F.Supp. at 330, a concentration which has continued to this day.

When the LRSD schools were closed for the 1958–59 school year, NLRSD, along with PCSSD, opened its segregated schools to many white and some black students from LRSD. These transfers continued in significant numbers until the mid–1960's and played a substantial role in delaying desegregation in LRSD. 584 F.Supp. at 339–40.

NLRSD has failed to comply fully with desegregation orders of the district court, *Davis v. Board of Education*, No. LR–68–C–151 (E.D.Ark.1977), and this Court, *Davis v. Board of Education*, 635 F.2d 730 (8th Cir.1980), with respect to the desegregation of faculty and staff. 584 F.Supp. at 348. Thus, blacks have a measurably smaller chance of being hired as teachers or administrators in NLRSD than in LRSD.

NLRSD maintains segregation within its school system in part by grossly overclassifying its black pupils into special education and educable mentally retarded (EMR) categories. It classifies over *nineteen percent* of its black students as retarded or learning disabled, nearly *three and one-half times as many as are similarly classified in LRSD.* 584 F.Supp. at 348. Moreover, its EMR placement rate for blacks is 8.9 times higher than it is for whites, compared to a national average placement rate of two and one-half times as many black students as white students. Placing children in Special Education: A Strategy for Equity 10 (K. Heller, W. Holtzman, and S. Messick, eds. 1982).

■ NLRSD argues that the overrepresentation of blacks in its EMR classes can be explained by economic and social factors, as well as differences in IQ between black and white students. The district court rejected this argument after hearing all the expert testimony on the issue. It did not err in so holding. These factors may explain why there may be more black than white EMR students, but they do not explain why the NLRSD experience should be so different than that in the nation, in Arkansas or in LRSD, nor do they explain why black students are not similarly overrepresented in the specific learning disability categories. The appellees' experts attributed this difference in EMR classification to race, and the district court was justified in accepting this opinion and in

holding that this difference discouraged black students from attending that district.

### E. Interdistrict Housing Violations by the Defendants.

■ The district court made detailed and extensive findings regarding the existence of segregated housing in the Little Rock metropolitan area and regarding the causal role of the State of Arkansas and PCSSD in creating and perpetuating this condition. After reviewing these findings for clear error, we find none, and conclude that the record amply supports the district court's determination.

The district court found that "[p]ublic housing in Pulaski County has historically been the subject of racial segregation." *Little Rock School District v. Pulaski County,* 584 F.Supp. 328, 341 (E.D.Ark. 1984). As with private housing patterns, this demographic fact is the product of interrelated discriminatory conduct on the part of the state and the county. The state delegated its responsibility in public housing to city and county governments by authorizing them to operate housing authorities upon the adoption by each of an appropriate enabling resolution. Ark.Stat. Ann. § 19–3004. The cities of North Little Rock and Little Rock have adopted these resolutions, but Pulaski County has not done so. Although the resolutions empower the cities to develop and construct public housing projects up to ten miles beyond city limits, neither city housing authority has ever built a project in PCSSD, and the record does not indicate that Pulaski County has constructed such housing. *Id.* at 341.

Typical of the pattern of development was the 1953 Granite Mountain public housing project. B. Finley Vinson, chairman of the board of the holding company which owns the largest bank in Arkansas and who was an executive with the Little Rock Housing Authority from 1950 to 1954, testified that, in the early 1950's, the state, the Little Rock Housing Authority, LRSD, and PCSSD cooperated in the development of a major all-black housing project which was intended to channel black residential development toward the far southeast boundaries of the City of Little Rock, away from white residential areas. He stated that "[i]t should be made very clear that * * * this was a device to maintain segregation of races. * * * There was no bones made about it." Although this land was part of PCSSD, the decision was also made at the state and local level for LRSD to annex this territory from PCSSD to ensure that this black development was channeled into LRSD, which was the only district capable of providing education for blacks. Mr. Vinson testified that the LRSD "worked out the annexation with the County School District." In order to effect this transfer of land from PCSSD to LRSD, the Arkansas legislature in 1953 passed an act, Ark.Stat.Ann. § 80–436 (Repl.1980), which allowed the land transfer without resort to the standard procedures set forth in Ark.Stat. § 80–456. Mr. Vinson testified that over 500 segregated housing units were constructed at Granite Mountain (with clearance of forty or fifty preexisting units), and that, as was expected, many more segregated housing units were built in this area in the following years. This area is still an essentially segregated black housing area served by several schools which have overwhelmingly high black enrollments ranging from seventy-one percent to one hundred percent black.[13] In

13. There are five schools in the general area of the Granite Mountain project and the related segregated black housing which has grown around the project. Horace Mann Junior High in 1982 had an enrollment of 654 students, 501 of whom are black. Booker Intermediate had an enrollment in 1982 of 411 students, 342 of whom are black. Rockefeller Intermediate had an enrollment in 1982 of 402 students, 288 of whom are black. Carver Elementary had a 1982 enrollment of 495 students, all of whom are black. Washington Elementary had a 1982 enrollment of 307 students, 217 of whom are black. There are no high schools in this general area, and the students from this overwhelmingly black residential area apparently attend Central High School. In sum, without considering high school students, more than 2,000 students—approximately eighty percent of whom are black—live in the Granite Mountain project and related areas. These students generally at-

sum, there is substantial evidence in the record to support the district court's finding that PCSSD cooperated with the state, the Little Rock Housing Authority and LRSD in this intentional and successful attempt to segregate blacks in a nearly all-black neighborhood and in nearly all-black schools within LRSD. 584 F.Supp. at 342.

The district court also found that the Little Rock Housing Authority accentuated segregation in public housing and, thus, in schools, by razing black neighborhoods (which bordered on white areas) and relocating the uprooted blacks in housing projects in eastern Little Rock. White residents, whose neighborhoods were more selectively cleared, were relocated to western Little Rock. The district court found that these decisions were part of "a deliberate policy of the Little Rock Housing Authority and other governmental bodies to maintain a residential racial segregation." *Id.*

The concurrent acts of governmental bodies, especially the state and county school districts, are also reflected in the racially segregated private housing market in metropolitan Little Rock. The district court cited as especially probative of state liability the example of a black realtor who was disciplined by the state real estate commission. The realtor, who sold a home to a black in a white neighborhood, had violated a commission regulation which forbade realtors from being "instrumental in introducing into a neighborhood a character of property or occupancy, members of any race or nationality, or any individuals whose presence will clearly be detrimental to property values in that neighborhood." Although the realtor received his license, the state commission warned him about such "misconduct," and he was fired from his job. *Id.*

PCSSD also contributed to the segregated nature of the private housing market through its decisions in school siting. As

Chief Justice Burger has written, "People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the pattern of residential development of a metropolitan area and have important impact on the composition of inner city neighborhoods." *Swann*, 402 U.S. at 20, 91 S.Ct. at 1278. According to the district court's factual findings, PCSSD violated the *Zinnamon* decree by building nearly a dozen new schools after 1973 in the furthest outlying areas of developing white populations. These schools now have enrollments that are generally over ninety percent white. *Id.* at 346. As we have noted, *supra* at 28, 91 S.Ct. at 1282, Dr. Robert Dentler testified about the racially discriminatory nature of these school siting decisions. The district court concluded that decisions on school sites were made "without any consideration given to the impact or effect such selection would have on desegregation and is therefore a constitutional violation." *Id.* at 346.

The district court's generalized factual findings (which are based on the specific facts we have recounted here) are direct and unequivocal:

36. These housing practices, both public and private, together with the manner in which predominantly black areas were willingly transferred to the Little Rock School District from the Pulaski County Special School District contributed greatly to the disparity in the racial composition of these school districts. * * *

* * * * * *

66. The magnet factors of relatives, jobs and public housing units have encouraged high proportions of blacks migrating to move to the Little Rock School District.

*Id.* at 342, 345.

After careful review of the long record compiled below, we conclude that the dis-

tend junior high, intermediate and elementary schools which have enrollments which are over eighty percent black. The district court credited the testimony of Dr. Charles Willie, Professor of Education and Urban Studies at the Harvard

Graduate School of Education, that this all-black housing project was a significant "magnet factor" in attracting a disproportionate number of blacks to LRSD. 584 F.Supp. at 345, 347.

trict court's factual findings are valid and do not embody clear error according to the standard of review we have set forth above.

█ We also conclude that the district court committed no error of law in examining segregative housing patterns perpetuated by the state and PCSSD. As an aspect of school desegregation cases, the housing issue was first addressed by Justice Stewart, concurring in *Milliken I*:

> Were it to be shown, for example, that state officials had contributed to the separation of the races by drawing or redrawing school district lines, by transfer of school units between districts, *or by purposeful, racially discriminatory use of state housing or zoning laws,* then a decree calling for transfer of pupils across district lines or for restructuring of district lines might well be appropriate.

418 U.S. at 755, 94 S.Ct. at 3132 (emphasis added).

At least two courts of appeals have acted on Justice Stewart's suggested standard of liability and have held state governments responsible for remedying school segregation which was partially the result of state-authorized local housing authorities.[14] In the Indianapolis case, the district court recounted a long history of segregated housing, as a result of which less than one percent of Indianapolis's suburban population was black. *United States v. Board of School Commissioners,* 332 F.Supp. 655 (S.D.Ind.1971). The court attributed residential segregation (and, hence, school segregation) in part to housing violations committed by the Housing Authority of the City of Indianapolis (HACI). The court found that, from 1957 through 1971, HACI built public housing projects in areas within the Indianapolis Public School District (IPS) inhabited ninety-eight percent by Negroes, but none in the suburban school districts.

*United States v. Board of School Commissioners,* 456 F.Supp. 183, 189 (S.D.Ind. 1978), *aff'd in part & vacated in part,* 637 F.2d 1101 (7th Cir.), *cert. denied,* 449 U.S. 838, 101 S.Ct. 114, 66 L.Ed.2d 45 (1980). The district court held that

> the action of such official bodies in locating such projects within IPS * * * [was] racially motivated with the invidious purpose to keep the blacks within the pre-Uni-Gov Indianapolis and IPS, and to keep the territory of the added suburban defendants segregated for the use of whites only. * * *
>
> * * * [I]t was obvious that the natural, probable and foreseeable result of erecting public housing projects wholly within IPS territory would be to concentrate poor blacks in such projects and thus to increase or perpetuate public school segregation within IPS.

*Id.* at 189.

The Court of Appeals held that the district court's findings were amply supported in the record, *United States v. Board of School Commissioners,* 637 F.2d at 1110, and affirmed the district court's finding "that the decision in the 60's to locate all public housing in Marion County within the boundaries of IPS was the result of segregative intent by the responsible state agencies." *Id.* at 1111.

Although the district court in the Indianapolis case did not elaborate its reasoning, it found that, along with legislation which discriminatorily reorganized the City of Indianapolis relative to the Indianapolis School District, the state was responsible to some extent for the housing violations which exacerbated the segregation of the schools. The district court referred to HACI as a "state instrumentality," *United States v. Board of School Commissioners,* 419 F.Supp. 180, 182 (S.D.Ind.1975), and as we have noted above, as a "responsible

14. Although a majority of the United States Supreme Court has not specifically addressed the extent to which housing violations support interdistrict remedies in school desegregation cases, we note that the Supreme Court has denied certiorari in each of the cases we cite.

While this does not necessarily imply approval on the merits, it is a fact which "cannot be overlooked." *Liddell v. State of Missouri,* 731 F.2d 1294, 1203 n. 8 (8th Cir.1984), and cases cited therein.

state agency." As a result, the state was held responsible for funding certain ancillary services as part of the interdistrict remedy, which the Court of Appeals affirmed. *United States v. Board of School Commissioners,* 637 F.2d at 1116.

The courts reached a similar result in the interdistrict remedy that was adjudicated in the Wilmington, Delaware, case. The Wilmington Housing Authority operated over 2,000 public housing units in the city, but fewer than forty in the predominantly white suburbs, despite a period of "extraordinary population growth" in the suburbs. *Evans v. Buchanan,* 393 F.Supp. 428, 435 (D.Del.) (three-judge court), *aff'd per curiam,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975). As a result, the district court concluded that "[p]ublic housing policies also contributed to the concentration of minority residents in Wilmington." *Id.* The state's culpability and partial remedial responsibility in the interdistrict remedy was subsequently affirmed. *Evans v. Buchanan,* 582 F.2d 750 (3d Cir. 1978) (en banc).

The courts have not limited their attention to public housing violations; private housing discrimination has also been the basis for state liability in school desegregation cases. In *Evans v. Buchanan,* 393 F.Supp. at 434–35, a three-judge panel considered as evidence of state culpability that the Delaware Real Estate Commission, a state licensing agency, enforced a realtor's ethical canon which discriminated in the same regard as the provision cited in the case at bar. The district court reached the same result in *Oliver v. Kalamazoo Board of Educ.,* 368 F.Supp. 143, 183 (W.D.Mich. 1973), *aff'd sub nom. Oliver v. Michigan State Board of Education,* 508 F.2d 178 (6th Cir.1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). That Court concluded that "the State of Michigan should not be allowed to escape constitutional responsibilities by fractionalizing its jurisdiction through many agencies." *Id.* at 183.

Our review of these precedents, together with the Arkansas statutes and relevant case law, is an additional factor justifying imposition of remedial liability upon the State of Arkansas. First, as regards public housing, we note that the municipal housing authorities implicated here are agencies of the state, which obliges the state to participate in the remedial phase of this litigation. In construing the Housing Authority Act, Ark.Stat.Ann. § 19–3004 *et seq.,* the Arkansas Supreme Court has declared:

> A Housing Authority is an agent of the state dealing with public health standards and falls squarely within the traditional police powers of the state. A City Housing Authority does not operate within the scope of "municipal affairs" (*i.e.,* those affecting, germane to or concerning the municipality and its government) as distinguished from those state officers excepted in the Home Rule Act.

*Fort Smith v. Housing Authority of the City of Fort Smith,* 256 Ark. 254, 506 S.W.2d 534, 536 (1974). *See also Arkansas Louisiana Gas Co. v. City of Little Rock,* 256 Ark. 112, 506 S.W.2d 555, 558 (city and housing authority do not have a principal-agent relationship).

We believe the structure of the state housing authority law supports this reading. Although the state does not operate the housing authorities *per se,* the state legislature authorized the housing authorities (Ark.Stat.Ann. § 19–3004), promulgated a finding and declaration of statewide necessity for housing reform (§ 19–3002), established standards for the appointment, qualifications and tenure of the housing commissioners (§ 19–3005), enumerated the powers of housing authorities (§ 19–3011) (including eminent domain (§ 19–3015)), and gave the authorities the power to issue bonds (§§ 19–3017–3019).

As regards private housing segregation, we believe that the state's role in regulating real estate practices through the Arkansas Real Estate Commission, *see* Ark. Stat.Ann. §§ 71–1303, 71–1307, also implicates it in the residential segregation that contributed to the racial segregation of the Little Rock schools.

The housing violations recounted above deeply implicate the state in the constitutional violations found by the district court. Any other finding by this Court would reward the state for dividing and delegating the functions of state government among its many branches and divisions. As the district court declared in the *Kalamazoo* case:

> The State * * * cannot parcel out its jurisdiction and delibertely achieve by bits and pieces what it could not do directly by statute. When such a situation is alleged to exist, the court must look closely at the actions of each agency to determine whether it has met its constitutional responsibilities. To allow each agency to plead constitutional violations of other agencies in exculpation of its own would be to mock the Constitution of the United States[.]

*Oliver v. Kalamazoo Board of Education,* 368 F.Supp. 143, 185 (W.D.Mich.1973), *aff'd sub nom. Oliver v. Michigan State Board of Education,* 508 F.2d 178 (6th Cir.1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). *See also* Note, *Housing Discrimination as a Basis for Interdistrict School Desegregation Remedies,* 93 Yale L.J. 340 (1983).

As a concurrent actor in the problem of housing discrimination, the PCSSD must also bear its share of the remedial burden. Where school boards have acted with complicity in developing schools in conjunction with discriminatory real estate development, they have been held responsible for their share of the remedy. *See, e.g., Oliver,* 368 F.Supp. at 171–73.

### F. Summary of Violations.

██ The state's actions which originally segregated LRSD and then forestalled its desegregation for over twenty years are not too remote in time to be relevant for this appeal. Rather, the long history of concurrent actions on the part of the state, PCSSD, and NLRSD exerted an unmistakable interdistrict effect on the schools of the metropolitan area by singling out LRSD as the school district which provided some educational opportunities for black students and by identifying PCSSD and NLRSD as white districts.

The acts which implicate the state as a primary constitutional violator began long before *Brown,* with a century-old, state-mandated dual school system which provided a markedly inferior education for black students. This dual system was achieved in part through the transfer of black students from NLRSD and PCSSD to LRSD. When the Little Rock Board of Education decided to comply with the Supreme Court's orders and desegregate its schools after *Brown,* the state intervened and prevented the Board from desegregating for nearly twenty years. The state persisted in opposing desegregation for thirteen years after *Brown,* and has only taken minimal actions to assist in the desegregation of its schools to this day.

Public and private housing policies exacerbated school segregation. Public housing units were segregated and most projects were built in black residential areas in LRSD or NLRSD to serve black families. No public housing units were built in PCSSD, but the Granite Mountain project was built on land deannexed by PCSSD with state approval with the intention that this all-black project would be located in LRSD and that this would ensure that black students would attend the segregated black schools in Little Rock. The effects of this action persist until this day.

The defendant school districts have acted concurrently and independently to perpetuate the interdistrict problem of school segregation. The long legacy of inferior schools for blacks in PCSSD and NLRSD (which was exemplified by the absence of an accredited black high school until after *Brown*) induced many blacks to attend school in LRSD, often with a subsidy from PCSSD or NLRSD. PCSSD has continued to signal this attitude by ignoring the *Zinnamon* decree: it has perpetuated segregation through school siting and student assignment, unequal apportionment of the transportation burden between the races, failure to meet staff hiring goals, overclas-

sification of black pupils in special education programs, and failure to cultivate the full participation of black students in the educational process.

Moreover, by its policies and practices with respect to annexation and deannexation, PCSSD has committed substantial interdistrict violations. Until the Supreme Court's decision in *Green* and this Court's implementation of that decision, PCSSD willingly consented to LRSD expanding simultaneously as the City of Little Rock expanded. After that year, the City continued to expand but the boundaries of the school district remained constant. There is conflicting evidence as to the reason for this, but the district court found that PCSSD declined to deannex this land for unconstitutionally discriminatory reasons, and we believe there is substantial support in the record for this finding. The effects of these policies and practices continue to be felt today. Nearly 5,000 students, more than eighty-seven percent of whom are white, now live within the city limits but attend PCSSD schools.

NLRSD has also contributed to interdistrict segregation, by failing to maintain adequate schools for blacks before *Brown*, by opening its segregated schools to LRSD transfers during 1958–59, by failing to comply with the desegregation orders of the district court, by grossly overclassifying its black pupils in EMR programs and by failing to desegregate the faculty and staff of its schools.

We believe it is clear that these actions by the defendants exerted a strong interdistrict influence which polarized the races and, by creating disparities in the availability and quality of black schools, set aside LRSD as the best place for black students to obtain an education. Undoubtedly, a significant percentage of white out-migration and black in-migration is attributable to factors other than racially discriminatory acts of the defendants. (These factors include the historical movement of white middle-class families from the city to the suburbs and the higher fertility rate of black families.[15]) However, plaintiffs introduced substantial evidence demonstrating that a "disproportionate" number of whites, 584 F.Supp. at 347, left LRSD or moved into PCSSD instead of LRSD upon moving from other areas and that substantially more blacks moved into LRSD than would otherwise have done so in the absence of the defendants' discriminatory actions and the resulting racial turmoil in LRSD.[16] The district court found, *id.*, that plaintiffs met their burden of proving that the defendants had committed substantial interdistrict constitutional violations with substantial and continuing interdistrict effects. In light of the substantial supporting evidence in the record, we cannot declare these findings clearly erroneous.

The defendants and amicus argue strongly that *Milliken I, supra, Lee v. Lee County Board of Education*, 639 F.2d 1243 (5th Cir.1981), and *Goldsboro City Board of Education v. Wayne County Board of Education*, 745 F.2d 324 (4th Cir.1984), dictate a contrary result. We disagree. In *Milliken I*, there was no history of state-imposed segregation, nor of state opposition to the local school district's attempt to comply with *Brown*, nor was there a his-

---

**15.** Significant numbers of white children attend private or parochial schools in Pulaski County. We are not able from this record to determine that the discriminatory acts of the defendants have contributed to this phenomenon, particularly in view of the fact that the number of students attending the schools in Pulaski County happens to be consistent with national norms for metropolitan areas.

**16.** The district court credited the testimony of Dr. Charles Willie, Professor of Education and Urban Studies at the Harvard Graduate School of Education, that the various intentionally discriminatory actions of the defendants outlined in this opinion contributed to the disproportionate movement of whites into PCSSD instead of LRSD. 584 F.Supp. at 347. He testified that, among other factors, the concentration of public housing projects in LRSD (particularly the all-black Granite Mountain project which served as the seed for three decades of segregated housing development), the existence of LRSD boundaries not coterminous with the City of Little Rock, and PCSSD's numerous violations of the *Zinnamon* decree (including school site locations) were of significance.

tory of interdistrict transfers, boundary changes, housing violations, and violations of desegregation decrees. Moreover, *Milliken I* involved the consolidation of one city district with fifty-three suburban districts in three counties, where the record was devoid of evidence indicating that the fifty-four districts were closely interrelated geographically, economically, politically and culturally, as the districts are here.

There are some superficial similarities between this case and *Lee*. In *Lee*, as here, there were two suburban districts and one city district located in a single county, and there was a history of interdistrict transfers in the pre-*Brown* period. But in *Lee*, the district court found that the interdistrict violations that had occurred were neither continuing nor significant, and the Court of Appeals for the Fifth Circuit simply held that this finding was not clearly erroneous. Here, as we have already noted, the district court found that the interdistrict violations were significant and continuing, and we simply hold that these findings are not clearly erroneous. Moreover, *Lee* did not involve segregative interdistrict transfers, segregative boundary changes, or state-imposed residential segregation, and the city district had been previously declared unitary.

*Goldsboro* is also distinguishable from this case on several grounds. Goldsboro had been declared a unitary school system

by the federal district court in 1973, *id.* at 325–26. Although the Goldsboro district alleged that Wayne County had established "white haven" schools, the district court found that the Wayne County school district built only one school during the period in question, to replace a sixty-year old school building. Here, PCSSD built nearly a dozen schools during the relevant period, and the district court found specifically that "the selection of sites for new schools built after the entry of the *Zinnamon* decree has been made without any consideration for the impact such selection would have on desegregation." 584 F.Supp. at 336–37. *See also id.* at 346.

Further, in *Goldsboro*, there was no showing that any government official or agency had ever opposed the location or construction of public housing within the Wayne County school district. 745 F.2d at 327. Moreover, there was no history of interdistrict transfers for segregative purposes, no district court finding of segregative annexations or boundary changes, nor any evidence of school district failure to comply with desegregation decrees.

## III. THE REMEDY.

### A. Proposed Remedies.

 From July 30, 1984, to August 2, 1984, the district court reopened the hearings to consider the appropriate remedy for interdistrict violations.[17] At the hearings,

---

**17.** The State Board, NLRSD and PCSSD argue on appeal that they were deprived of procedural due process in the course of the proceedings before the district court. We reject this contention.

The State Board argues that it was deprived of due process because the district court entered further findings on the State Board's liability in the remedial order, after the court had said it had concluded all proceedings concerning liability. We find no error in the district court's clarification of the State Board's liability. All findings by the district court concerning the State Board in the remedial order have substantial support in the record of the liability hearings, at which the State Board had a full opportunity to be heard.

NLRSD's several due process objections are similarly unpersuasive. It argues that the district court improperly ordered consolidation at

the conclusion of the liability proceedings while limiting the remedial hearing solely to the question of the proper *means* of consolidation. We conclude that any possible problems with the scope of the remedial hearings were cured when the district court reopened the remedial proceedings and heard testimony on alternative remedies. NLRSD complains that it was deprived of the opportunity at the reopened proceedings to cross-examine LRSD's experts, but a careful review of the record shows that the district court committed no error or abuse of discretion in this regard. NLRSD, in fact, was only deprived of the chance to recross-examine LRSD's expert witness, Dr. Dentler. The record indicates that NLRSD was able to cross-examine LRSD's expert for one and one-half hours, and we conclude that the district court was fully within its discretion to deny further inquiry. (We note also that PCSSD cross-examined Dr.

PCSSD and NLRSD each offered an alternative.

### 1. *PCSSD's Alternative.*

PCSSD submitted its plan on July 24, 1984, six days before the remedial hearing. The plan preserves the autonomy of the three county school districts and relies on the creation of a substantial number of specialty or magnet schools and "voluntary interdistrict transfers with mandatory backup." 597 F.Supp. at 1222.

PCSSD's plan calls first for the creation of a "substantial number of special schools and special program offerings * * * in each of the three present school districts," in addition to the traditional curriculum offered at "standard schools." J.D.R. at 2497. Suggested themes for specialty schools and programs in elementary schools include a gifted and talented program, a physical development program, a multi-language program, a lab school, a Piaget model school, an extended school day center, a Montessori school, a creative arts school, a personalized education program and a computer/science/math program. Junior high school themes include a gifted and talented program, visual communication, pre-international Baccalaureate program, physical development, arts program, ecology and environmental education, and math/science. Senior high school themes include college prep high school, high school for the performing arts, law enforcement program, engineering, communications, math/science, military academy, computer technology and business, electronics, drafting, ecology and environmental education, and a gifted and talented program.

PCCSD's plan requires all students in the three districts to choose the school they wish to attend, selecting from among any of the schools in the three districts. Students who do not receive their first or second choice of school due to oversubscription are to be "mandatorily assigned [to another school] by an interdistrict administrative committee composed of administrative personnel from each of the three districts."

Enrollments are to be controlled "to racially balance all schools in each of the controlled three districts at proportions approximating that of countywide public school enrollment in the preceding school year. * * * Specialty schools and specialty programs will be racially balanced at the countywide proportion plus or minus five percentage points." J.D.R. at 2506–07. Individual racial balance goals are proposed at "remote schools" with a minimum requirement by 1988–89 so that no less than fifteen percent of the remote school enrollment will be black. To facilitate interdistrict transfers, several policies are proposed, including the "effective schools" model and uniform grade structure including kindergarten, uniform grading, attendance and discipline policies.

PCSSD proposes that the three districts share vehicle capacity, routing and supervision of the transportation system, that they consider the joint contract purchase of a computerized routing and scheduling system, and the purchase of identical vehicles, the joint purchase of fuel and parts, the sharing of repair facilities and enforcement of common regulations. J.D.R. at 2509.

---

Dentler extensively.) None of NLRSD's other references to the record reveal improper limitation by the district court of NLRSD's opportunity to cross-examine witnesses. Nor was NLRSD improperly deprived of an opportunity to present its own expert testimony. The district court was well within its discretion in excluding NLRSD's proffered evidence concerning surveys and other testimony about the extent of interdistrict effects. NLRSD had an adequate opportunity to present such evidence concerning the scope of the violations at the liability hearings, and the district court properly limited the scope of the remedial hearings to alternative remedial plans.

PCSSD raises similar due process complaints which we reject as well. Any concern with the district court choosing consolidation as the appropriate remedy in its order at the conclusion of the liability proceedings was alleviated by the opportunity to present remedial alternatives. Moreover, the district court's findings concerning liability were sufficient to allow PCSSD to present remedial alternatives which would address the scope of the violations.

Its plan requires that the costs associated with interdistrict assignment of students be shared by all three districts in an equitable manner and that districts receiving students from another district be reimbursed on a per capita basis. J.D.R. at 2511. It notes that, although transportation costs should be shared, financial support from the state must be made available. *Id.*

PCSSD also proposed the formation of several tri-district committees which would discuss cooperative ventures in several areas such as food preparation and delivery and maintenance service. Under this proposal, the three district controllers would meet in committee to discuss details of cost sharing and to explore other areas of financial cooperation, including establishment of a single millage rate in Pulaski County, coordinated millage campaigns, coordinated marketing of revenue bonds, common audit and accounting procedures, joint proposals for special grant or project funds, and joint bidding and purchasing practices. PCSSD would require the formation of a similar committee to "formulate and suggest criteria for the opening and closing of facilities as well as for renovating or expanding existing schools." Under its proposal, it would appear that the committees would be biracial.

PCSSD proposes that faculty from all three districts be recruited to teach in the specialty schools, and that teachers accepting interdistrict assignments maintain contractual relationships with their home districts but that they be subject "to all other rules and procedures applicable to the schools in which they teach." PCSSD also proposes interdistrict cooperation on a variety of personnel matters.

PCSSD's principal objection to the consolidation remedy ordered by the district court is that it destroys the institutional strengths of an ongoing school district and impedes local control of public schools. *See Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977) (*Milliken II.*)

PCSSD argues that its plan "would represent a strong step forward both in raising the quality of education for all and in improving the prospects for a permanently viable, racially-integrated system of public schools throughout Pulaski County." J.D.R. at 2517. The district court found, however, that PCSSD's plan places "undue reliance on voluntary transfers * * * [and] fails to adequately address the interdistrict segregative effects found to exist and cannot be approved." 597 F.Supp. at 1223.

### 2. *NLRSD's "Masem/Western Wedge" Alternative.*

Shortly before the July 30, 1984, remedial hearing, NLRSD submitted a statement which argued that consolidation of the three districts exceeds the scope of the interdistrict violations found by the court, and, particularly, those attributable to NLRSD, but that "NLRSD believes that the deannexation violation of the Pulaski County School District requires remedy. A fair and equitable remedy would be to adopt a 'western wedge' concept similar to that proposed by Dr. Paul Masem in Intervenor Joshua Exhibit Number 2, Option A." J.D.R. at 1788.

The "Masem/Western Wedge Plan" calls for all three districts to retain their separate and autonomous identities. The boundaries of NLRSD would remain unchanged, but the boundaries between LRSD and PCSSD would be changed to "compensate for the loss of approximately 4,000 white students to the Little Rock School District caused by [PCSSD's] deannexation violation." J.D.R. at 1787–88. PCSSD north and west of Interstate 30 and south of the Arkansas River would become part of LRSD. LRSD east and south of Interstate 30 would become part of PCSSD. As a result of the proposed boundary changes, "the racial composition of the districts, not counting student transfers between districts, will be as follows:

| | | |
|---|---|---|
| Pulaski County Special School District | 69%(W) | 31%(B) |
| Little Rock School District | 46%(W) | 54%(B) |

| North Little Rock School District | 64%(W) | 36%(B) |
|---|---|---|

NLRSD proposes an interdistrict magnet school program and an interdistrict majority-to-minority (m-to-m) student transfer program to promote desegregation in the three districts. Ten to twelve magnet schools, which would offer programs such as computers, math and science and back-to-basic fundamental schools, would be located in central Little Rock. The m-to-m program would provide transportation between all Pulaski County schools within some maximum travel time such as thirty to forty-five minutes. Each school in Pulaski County with less than thirty percent black enrollment would set aside seats for transfer students, with priority for Little Rock black students.

An Interdistrict Policy Board, with representatives from each district and from the Joshua intervenors, would be established to administer and coordinate the various provisions of the plan. The Board would receive funding from each of the three school districts, and it would establish a citizens' advisory board to channel community input and participation.

NLRSD's plan also calls for compensatory and remedial programs in all three districts to increase the educational achievement of black students. The Interdistrict Policy Board would hire outside consultants to ensure that all three districts have adequate compensatory programs.

The district court rejected the NLRSD plan on the ground it "places too much reliance upon the voluntary motivations of the county patrons [and] there are insufficient incentives * * * to expect the [interdistrict] transfers * * * to be successful in desegregating[.]" 597 F.Supp. at 1223. The court concluded that "the NLRSD plan fails to adequately address the interdistrict constitutional violations found by the Court[.]" *Id.*

3. *The Joshua Intervenors' Alternative.*

The Joshua intervenors did not advance a particular plan but presented a position statement in favor of consolidation but which was critical of several aspects of LRSD's consolidation plan. Their expert witness, Dr. Paul Masem, testified about three plans for remedying the inter- and intradistrict violations short of consolidation. These plans were primarily concerned with alterations in the present boundaries of the three districts. The district court rejected the options on the ground they would not "adequately remedy the constitutional violations found by the Court." 597 F.Supp. at 1224.

4. *The LRSD Alternative.*

The district court determined that LRSD's plan was the only proposal which would adequately address the interdistrict and intradistrict violations which were established at trial.

The principal component of the LRSD plan is consolidation of the three school districts. This plan utilizes a geocoding process of arriving at student assignment areas, and it divides Pulaski County into six subdistricts. The plan establishes a racial composition standard of ( + ) or (-) twenty-five percent of the racial makeup of the student population. To facilitate student transfers, the schools are to be of equal quality and grade structure.

LRSD's plan also calls for the creation of magnet schools at Metropolitan Vocational High and in areas populated primarily by blacks. The plan calls for desegregation of administrative staff at all levels and in all units. It provides for an interim board of directors which will select a qualified school superintendent. The court stated that it would soon set the date for an election of persons to replace the interim court-appointed board. The court also determined that, after study by the new superintendent and the interim board, a determination would be made as to the millage rate to be uniformly applied within the consolidated district.

The court also directed the three districts to hold at least three public meetings in their districts to explain the consolidation

plan and to accept constructive criticism. The court then determined that it was premature to address the concerns of the Knight intervenors with respect to faculty assignments because many potential contract problems should first be dealt with by the interim boards.

Finally, the court reiterated that the state had taken actions and inactions over the years which "had an interdistrict effect upon the Little Rock, Pulaski County and North Little Rock school districts." 597 F.Supp. at 1228. "Other branches of the state, as set forth in the court's earlier opinion * * * share responsibility with the State Board for these constitutional violations, but the State Board must be the remedial vehicle for their violations as well[.]" 597 F.Supp. at 1228 (citations omitted). The court then stated that it would detail the "precise nature of these financial and oversight obligations" at a later date. *Id.*

### B. The Required Remedy.

 Having found interdistrict violations by the state and defendant school districts, and having heard from all of the parties concerning the remedial alternatives, the district court was responsible for devising a remedy that would correct the constitutional violations that it found. A federal court has broad equitable power to devise a desegregation remedy. The overriding goal of such a remedy is to eradicate all vestiges of state-imposed segregation. *Swann v. Board of Education,* 402 U.S. 1, 15–16, 91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554 (1971); *Green,* 391 U.S. at 437–38, 88 S.Ct. at 1693–94. Three equitable principles guide the courts in this process: (1) the nature of the remedy is determined by the nature and scope of the violation; (2) the remedy must, to the greatest degree possible, be designed to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct; and (3) the courts must take into account the interests of state and local authorities in managing their own affairs,

consistent with the Constitution. *Milliken II,* 433 U.S. at 280–81, 97 S.Ct. at 2757–58.

 In constructing a desegregation remedy, a court may not rigidly require a particular racial balance. *Pasadena Board of Education v. Spangler,* 427 U.S. 424, 436–38, 96 S.Ct. 2697, 2704–06, 49 L.Ed.2d 599 (1976); *Milliken I,* 418 U.S. at 739–40, 94 S.Ct. at 3124–25; *Swann,* 402 U.S. at 22–25, 91 S.Ct. at 1279–81. Nevertheless, the Supreme Court has made it clear that the awareness of the racial composition of a school district or school districts is a useful starting point in developing an effective remedy, and thus the limited use of racial ratios is within the Court's equitable discretion. *Swann,* 402 U.S. at 25, 91 S.Ct. at 1280.

Thus, the Supreme Court has approved a remedy imposed by the district court requiring that all schools in the school district be roughly within the same racial balance. *Columbus Board of Education v. Penick,* 443 U.S. 449, 455 n. 3, 99 S.Ct. 2941, 2945 n. 3, 61 L.Ed.2d 666 (1979); *Swann,* 402 U.S. at 23–25, 91 S.Ct. at 1279–80. Our Court has consequently approved the use of flexible ratios in desegregation remedies on numerous occasions. *E.g., Liddell v. State of Missouri,* 731 F.2d at 1302 & n. 7; *Clark v. Board of Education of Little Rock,* 705 F.2d 265, 269 & n. 6 (8th Cir.1983); *Liddell v. Board of Education of St. Louis,* 667 F.2d 643, 649 & n. 6 (8th Cir.1981); *Adams v. United States,* 620 F.2d 1277, 1296 & n. 30 (8th Cir.1980); *Morrilton School District No. 32 v. United States,* 606 F.2d 222, 230–31 (8th Cir. 1979); *Booker v. Special School District No. 1,* 585 F.2d 347, 353–55 (8th Cir.1978); *United States v. School District of Omaha,* 521 F.2d 530, 547 (8th Cir.), *cert. denied,* 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280 (1975). In any event, in this case, we have closely tailored the remedy to the violations and we are not requiring a particular racial balance in each district.

 We sustain the district court's holding that the interdistrict violations by the defendants justify interdistrict relief to the extent noted below. The more trouble-

some question is whether the district court erred in holding that consolidation was the only remedy that would effectively cure the interdistrict violations. We hold that the district court erred in that regard. In so holding, we express our agreement with the district court that consolidation would be a cost-effective and efficient method of desegregating the three school districts, but under *Milliken I*, we cannot require that remedy unless it is essential to correct a constitutional violation.

For three reasons, we do not believe we can require consolidation. First, that remedy exceeds the scope of the violations. It was based in part on the finding that the school districts were not autonomous, and we have held that that finding is not supported by the evidence. To be sure, the three districts did cooperate with each other through the late 1960's to maintain a dual school system in each of the districts, but each district retained its own identity, elected its own school board, fixed its own budget, hired its own faculty and staff, developed its own transportation system, constructed its own schools, and either agreed or disagreed to proposals to annex or deannex sections of its district to another.[18]

Second, other remedial measures are better designed to restore the victims of segregation in the Pulaski County Schools to the position they would have occupied absent discriminatory conduct. Thus, the violations relating to annexations and deannexations, segregated housing, school siting, student assignments, special education,

transportation, employment of faculty and administrators, and black participation in school affairs can all be corrected by the carefully tailored guidelines for a remedy to be established by the district court as set forth below.

Third, the remedy we have set forth preserves the important interests the three school districts have in managing their own affairs. As the Supreme Court stated in *Milliken I*, "the notion that school district lines may be casually ignored or treated as a mere administrative convenience is contrary to the history of public education in our country. * * * Local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to the quality of the educational process." *Milliken I*, 418 U.S. at 741–42, 94 S.Ct. at 3125–26.

In the light of the above circumstances, and the requirement that our remedy be closely confined to one that will remedy violations found to exist, we remand to the district court with directions to modify its remedy [19] to embody the following principles:

1. Each school district shall remain independent with an elected school board with its own administrative structure and powers of taxation.

2. The boundaries of NLRSD are to remain as they are at the present time. This is in partial recognition of the fact that the nature and extent of its interdistrict violations are less severe than those of the other defendants. Moreover, the black-

---

**18.** Additionally, the district court, in reaching its decision that the districts were not autonomous, gave weight to the fact that many white students transferred from PCSSD to NLRSD and LRSD in the period from 1954 to 1973, and that tuition in most instances was paid for by the sending to the receiving district. We do not feel that these transfers constitute sufficient evidence to establish a lack of autonomy.

**19.** 28 U.S.C. § 2106 provides, in pertinent part:
 The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree or order of a court lawfully brought before it for review[.]

Appellate modification has been described as an "inherent ability," *Petition of U.S. Steel Corporation*, 479 F.2d 489, 500 (6th Cir.1973), *cert. denied*, 414 U.S. 859 (1974), which this Court has exercised on several occasions, *e.g.*, *In re Thompson*, 642 F.2d 227, 229 (8th Cir.1981) (en banc). The Fifth Circuit has exercised its authority under this section to modify district court remedies in school desegregation cases. *Conley v. Lake Charles School Board*, 434 F.2d 35, 39 (5th Cir. 1970); *Ross v. Dyer*, 312 F.2d 191, 194 (5th Cir.1963); *Bush v. Orleans Parish School Board*, 308 F.2d 491, 503 (1962).

white school population of this district approximates that of the county as a whole. Little or no good purpose would be served by changing its boundaries. The NLRSD, however, shall be required to correct each of the constitutional violations found by the district court, and to comply fully with the prior orders of the district court and this Court. It will thus be required to make the necessary modifications to its student assignment plan, the employment of black administrators and principals, and the adoption of a racially neutral plan evaluating and placing students requiring special education. It will also be required to cooperate in the interdistrict aspects of the remedy outlined herein.

3. The district court, after a hearing, shall adjust the boundaries between PCSSD and LRSD as follows:

(a) All land within the City of Little Rock shall be assigned to LRSD, and the students living in that area shall be assigned to schools in LRSD.[20]

(b) All land in the Granite Mountain area will be included in PCSSD, and the students living in that area shall be assigned to schools in PCSSD. The record is not clear as to the precise boundaries of this area, thus evidentiary hearings will be held by the district court to determine them. It is the intent of this Court that the boundaries of this area shall reasonably reflect the area that was impacted by the 1953 deannexation of land from PCSSD to LRSD.

(c) In lieu of the adjustments indicated in (a) and (b), the district court, upon application by a party to this appeal, may conduct evidentiary hearings to determine whether adjustments other than those indicated in (a) and (b) would have substantially the same impact on the student populations of each district and would better meet the educational needs of the students of the districts involved. After such hearings,

the district court may make adjustments to the boundaries other than those indicated above if it finds that they would better meet the educational needs of the students, and would remedy the constitutional violations to the same extent as the adjustments in (a) and (b).

4. After the boundaries between LRSD and PCSSD have been adjusted, each school district as reconstituted shall be required to revise its attendance zones so that each school will reasonably reflect the racial composition of its district. Consistent with earlier district court orders with respect to these schools, school districts may, where necessary, be permitted to depart from this remedial guideline in that school enrollments may over- or underrepresent blacks or whites by as much as one-fourth of the remedial guideline for either race. We see no reason why, on this record, the variance should exceed this level. *See Columbus,* 443 U.S. at 455, n. 3, 99 S.Ct. at 2945, n. 3; *Swann,* 402 U.S. at 23–26, 91 S.Ct at 1279–81. If the four all- or nearly all-black elementary schools as conditionally allowed by this Court in *Clark v. Board of Education of Little Rock,* 705 F.2d 265 (8th Cir.1983), are retained in LRSD, compensatory and remedial programs of the type that we required for the nonintegrated schools in St. Louis shall be put into effect for the four schools. *See Liddell v. State of Missouri,* 731 F.2d at 1312–18. The additional cost of these programs shall be paid for by the State of Arkansas.

The district court may also consider the special problem of a few remote schools in Pulaski County. The June 4, 1973, decree of Judge J. Smith Henley permitted PCSSD to deviate from the racial standards that he established for the school system by allowing deviation from the standard in one or two schools distant from the black community. The district court should consider

---

**20.** This remedy is based on all of the defendants' interdistrict violations outlined in this opinion, including the violations relating to school sitings, annexations and deannexations, lack of any low-income public housing in

PCSSD, student assignments, special education, transportation, employment of faculty and administrators, as well as the pre- and post-*Brown* interdistrict transfers and the other historical violations with continuing effect.

whether the exception granted by Judge Henley should be permitted to continue.

5. Voluntary intra- or interdistrict majority-to-minority transfers shall be encouraged, with the State of Arkansas being required to fund the cost of transporting students opting for interdistrict transfers and to pay benefits to the sending and receiving schools for the interdistrict transfers similar to those required to be paid in *Liddell.* All three defendant school districts in Pulaski County shall be included in this program. To facilitate these transfers, the proposals of the PCSSD for "effective schools model," uniform grade structures, grading, attendance and discipline policies shall be carefully considered.

6. The district court may require a limited number of magnet or specialty schools or programs to be established at locations to be determined initially by a Magnet Review Committee and approved by the district court after a hearing. (Both PCSSD and NLRSD have made thoughtful proposals in this regard.) The magnet schools, if ordered, shall be administered by a Magnet Review Committee with one person to be named by each school district and two persons to be named by the State of Arkansas. The State of Arkansas will be required to pay the customary state aid to any pupils attending these schools, plus an additional one-half of the cost of educating the students attending them. The local share of the cost of any magnet school established shall be paid by the three participating schools on a basis to be determined by the district court. The state shall also be required to pay one-half of the cost of the construction or rehabilitation necessary to house the magnet schools and the full cost of transporting any students who attend them. *See Liddell VII,* 731 F.2d at 1309–12.[21]

7. PCSSD's proposals with respect to cooperative programs set forth on pages 430–31 of this opinion should be seriously considered by the district court and implemented where feasible.

8. If the boundary changes result in PCSSD or LRSD losing a substantial portion of their tax bases, the district court shall consider measures to equalize the tax rates in these districts. The court may also consider whatever other financial measures it or the parties consider necessary, including retirement of bond issues, to ensure an equitable transfer of benefits and obligations accompanying the boundary changes and the corresponding transfer of physical plant and related debt.

Each party to this appeal is to bear its own costs, with the exception of the Joshua Intervenors, whose costs will be borne equally by the State Board, LRSD, PCSSD and NLRSD.

This action is remanded to the district court for further action consistent with this opinion.

ARNOLD, Circuit Judge, concurring in part and dissenting in part.

**I.**

I agree with much of the Court's able opinion. In particular, I approve completely of its decision not to order consolidation of the three school districts now operating in Pulaski County, Arkansas. Consolidation would mean destruction of three popularly governed units of local government, and substitution in their stead of one judicially created and judicially supervised school district. Such a remedy is well within the judicial power of the United States, and I should not hesitate to support it upon proper proof, but the proof here is insufficient for several reasons, the most important of which is that the remedy of consolidation "exceeds the scope of the [parties' constitutional] violations." *Ante* at 434.

---

**21.** On the basis of *intra*district violations in *Liddell,* this Court ordered the State of Missouri to pay for programs similar to those described in paragraphs 5 and 6. *Liddell v. State of Missouri,* 731 F.2d 1294, 1305–12. Thus, even if there were no interdistrict violations in this case, on the basis of intradistrict violations by the state, this Court may order a similar remedy against the state.

Consolidation is a drastic step that should be reserved for clearer cases.

Having rejected consolidation, the Court proceeds to analyze the record and set out a detailed remedial decree, to be administered by the District Court on remand. The relief ordered today differs greatly from that ordered by the District Court. If we are not prepared to affirm what that court has done, we should remand this case for further findings and a detailed remedial decree. Although we have *power* to modify a decree at the appellate level, it is unwise to exercise that power. The District Court (though we are today disagreeing with some of its conclusions) is presided over by a scholarly and distinguished judge. That court, not this one, is in the best position to write a decree. Instead, a decree today springs full-grown from the brow of this Court, a decree that will, I dare say, startle all the parties to this case, including even those (if there are any) who like what they see.

Since the Court has decided to award detailed relief at the appellate level, however, it is appropriate for me to indicate in what respects I agree with its opinion. I agree that the District Court's findings of intradistrict violations on the part of the North Little Rock School District (NLRSD) and the Pulaski County Special School District (PCSSD) are not clearly erroneous and should be affirmed. These violations should be corrected. Moreover, the Court properly declines to change the boundaries of NLRSD. Its constitutional defaults have not been shown to have any significant current interdistrict effect. It is also appropriate to order compensatory and remedial education programs for the four virtually all-black schools that we allowed in the Little Rock School District (LRSD) in *Clark v. Board of Educ. of the Little Rock School District*, 705 F.2d 265 (8th Cir.

1983). (A similar remedy might also be in order for some racially identifiable schools in NLRSD and PCSSD.) The State of Arkansas should pay for these programs. The State's long-continued violation of the Fourteenth Amendment has played a significant part in bringing about this *intra*-district condition of racial isolation.[1] Some other aspects of the Court's remedy, for example, voluntary transfers, either intradistrict or interdistrict, of students from schools where they are in a racial majority to those where they are in a minority, seem unobjectionable.

The Court directs that the boundary between LRSD and PCSSD be adjusted so that all land within the City of Little Rock shall be assigned to LRSD. It also directs the re-transfer of the Granite Mountain area to PCSSD. And, wisely, the Court's opinion leaves it open to any party, on remand, to move the District Court to make different boundary-line adjustments, so long as they have substantially the same impact on the student populations of each district. I concur in the result reached by this portion of the Court's opinion, though for reasons somewhat different from those it gives. In my view, PCSSD's constitutional violations, when considered as a whole, have had some interdistrict effect, and the boundary changes ordered by this Court are a fair approximation of the measures necessary to undo that effect. There is necessarily some imprecision in this reasoning, and it rests as much on inference as on direct evidence, but it is not unfair for the risk of erroneous decisionmaking that this kind of imprecision creates to fall, at least in part, on those who have violated the Constitution. In reaching this conclusion I am heavily influenced by expert testimony that the District Court believed, and that, accordingly, we are also obliged to accept under the clearly-erroneous rule.

---

1. The State argues that we cannot require it to spend more money in one school district than another, because to do so would conflict with a recent opinion of the Supreme Court of Arkansas requiring, under the State Constitution, substantially equal per-pupil funding throughout the State, *DuPree v. Alma School Dist. No. 30,*

279 Ark. 340, 651 S.W.2d 90 (1983), and with a statute implementing this opinion, Ark.Stat.Ann. §§ 80–850.10—80–850.22. This argument is insubstantial. Under the Supremacy Clause, U.S. CONST. Art. VI., cl. 2, the Fourteenth Amendment overrides any inconsistent state statute or constitutional provision.

From the remaining features of the Court's remedy, especially its imposition of large financial responsibility on the State of Arkansas for the construction and operation of magnet schools, I respectfully dissent.

## II.

One fact stands out after a reading of the District Court's and this Court's opinions: LRSD has more black students than either NLRSD or PCSSD. In the school year 1983–84, LRSD's enrollment of 19,052 was about 69% black and 31% white, Tr. 1448, while PCSSD's enrollment of 27,839 was about 22% black and 78% white, PCSSD X 64, Table 1. LRSD's black percentage has been growing steadily, and one senses that the major impetus behind the District Court's decision to order consolidation is a determination not to permit LRSD to become all black, or virtually so. As a policy matter, I agree that such a result is desirable. An all-black district may have problems raising adequate funds from the property tax, since most voters in the district will still be white, whatever the makeup of the public schools' student body. It is also true that both black and white students benefit, socially and educationally, from exposure to each other.[2] These facts, certainly relevant in a legislative sense, are less directly so in the present judicial context. Our task as judges is not to force these school districts to do what we think is right or socially good, but to apply the law to the facts and announce the result, whatever it may be.

Analysis must start with the governing legal standard laid down by the Supreme Court. It is stated in *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I.*):

> The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional

violation. *Swann*, 402 U.S., at 16 [91 S.Ct. at 1276]. Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation. Thus an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation. Conversely, without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy.

418 U.S. at 744–45, 94 S.Ct. at 3126–28. The Supreme Court also tells us that no particular degree of racial balance is required by the Constitution, *id.* at 740, 94 S.Ct at 3125; that "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools," *id.* at 741, 94 S.Ct. at 3125; that "[t]he constitutional right of the Negro respondents residing in Detroit is to attend a unitary school system in that district," *id.* at 746, 94 S.Ct at 3128; and that "[t]he suggestion ... that schools which have a majority of Negro students are not 'desegregated' ... finds no support in our prior cases," *id.* at 747 n. 22, 94 S.Ct. at 3128 n. 22.

I also find significant the Supreme Court's summary of the reasoning of the

---

**2.** The proposition that all-black schools or classrooms are necessarily educationally inferior, however, is quite a different thing, and I do not subscribe to it. The "blacker" LRSD, ironically, appears by all accounts to produce more scholars of note and to offer a broader selection of courses, than the "whiter" districts with which it wishes to merge.

lower courts whose decisions it was reviewing:

> Viewing the record as a whole, it seems clear that the District Court and the Court of Appeals shifted the primary focus from a Detroit remedy to the metropolitan area only because of their conclusion that total desegregation of Detroit would not produce the racial balance which they perceived as desirable. Both courts proceeded on an assumption that the Detroit schools could not be truly desegregated—in their view of what constituted desegregation—unless the racial composition of the student body of each school substantially reflected the racial composition of the population of the metropolitan area as a whole.

418 U.S. at 739–40, 94 S.Ct. at 3124–25.

### A.

Applying this standard, I look first at the constitutional violations attributed to PCSSD. That such violations have occurred, both before and after the desegregation decree entered against PCSSD in the *Zinnamon* case, I do not doubt. Perhaps most shocking is the fact that current PCSSD board members, far from being familiar with the *Zinnamon* decree, had not even read it when they testified in the District Court. But the question for present purposes must be, what is the *current* interdistrict effect of these violations? See *Goldsboro City Bd. of Educ. v. Wayne County Bd. of Educ.*, 745 F.2d 324, 330–31 (4th Cir.1984); *Lee v. Lee County Board of Education*, 639 F.2d 1243, 1260 (5th Cir. 1981). Have they caused more white children to come to PCSSD schools, or black children to leave or avoid them, than would

otherwise have been the case? If so, to what extent? These questions must be answered, else the remedy will not fit the violation, nor the punishment fit the crime.

1. A great deal of stress is laid upon the fact that, before the *Brown* decision and for a time thereafter, the education provided by PCSSD for black children was grossly inferior to that provided for white children in PCSSD and to that provided for all children, black and white, in LRSD. As a consequence, some black children came to LRSD to go to school who would not otherwise have been there. But what current effect is this movement, much of which dates from 50 years ago, having? If black students came to LRSD for an education, and then went back home or elsewhere to work and raise their families, obviously their migration would not now be producing any current effect on the racial character of the LRSD student body. It is true that if black parents moved to LRSD and remained there, their descendants might now be attending LRSD schools. The Court appears to have this sort of movement in mind when it says that "[s]ome black families moved from the county to Little Rock because of the disparities in educational opportunities," *ante* at 418, but the record reference cited for this statement, J.D.R. 915–19, in fact contains no support for it.[3] The transfers that did occur appear to be principally of students moving into LRSD, without their parents, to live with a relative. One of LRSD's own witnesses testified, Tr. 116, that this kind of movement of students into LRSD ceased in the 1950's, when state laws requiring school children to be domiciled in the district where they were going to school began to be strictly enforced.[4] In addition,

---

3. Some white students also transferred to LRSD seeking a "city school education." PCSSD X 51, at p. 62; Tr. 118 (LRSD's witness); PX 36. It was not just black schools in LRSD that were superior. All schools there were regarded as better, and this is hardly sinister or surprising, since Little Rock is the only true urban center in Arkansas and is much richer than many of the other school districts.

4. The Court seems to agree that significant interdistrict movement of students stopped 20 years ago. *Ante* at 415. And even in the days when it was occurring, it was not simply a matter of black students transferring into LRSD. Between 1953 and 1963 more whites than blacks transferred from PCSSD to LRSD. PX 36. Some of the specific figures are instructive: In 1953–54, 47 black and 223 white children transferred from PCSSD to LRSD; in 1956–57, 42 black and 254 white; and in 1959–

any movement of black families into Little Rock that did occur must have been, to some extent, simply a part of the larger phenomenon of poor people leaving the farm to seek opportunity in the city.

2. The Court stresses that historically, that is, when PCSSD was first formed, it was the intention of LRSD and PCSSD to expand the boundaries of LRSD *pro tanto* every time the City of Little Rock annexed additional territory, so that the City and LRSD would continue to be coterminous. This intention has not been adhered to: the City has annexed a good deal of territory that has remained within PCSSD and not been transferred to LRSD by "deannexation." But only if PCSSD has declined to transfer territory to LRSD for racial reasons, in order to keep itself "white" and LRSD "black," would this failure to "deannex" justify interdistrict relief. (No one claims that school-district lines were drawn *initially* for racial reasons: back in 1927, when PCSSD was formed, segregation was not thought to be unconstitutional, and no one needed to gerrymander school-district boundaries to preserve it. The claim is, rather, that the PCSSD–LRSD line was *maintained* for racial reasons.)

There have been eight separate transfers of territory from PCSSD to LRSD (and apparently none from LRSD to PCSSD). Of these eight transferred areas, seven have been predominantly white. Tr. 948–49. This is hardly the action of a school district seeking to maintain its "whiteness." (The exception is the Granite Mountain area, deannexed in 1953, of which I shall speak hereafter.) The Court's point, though, is a bit different: it charges that when it became clear that some real desegregation was going to take place, the boundaries hardened. Dr. Robert A. Dentler, LRSD's principal expert witness, made the same point. "[T]he County I found had decided in its Board of Directors to make a formal policy of no further deannexations in 1968 ...." Tr. 343. This new policy,

the Court now infers, was based on racial animus, a desire to keep the black percentage in PCSSD down.

In fact, the PCSSD Board voted, on May 14, 1968 (and LRSD now concedes this) *in favor of* the concept of consolidation with LRSD. Floyd Parsons, Superintendent of LRSD from 1962 to 1971, confirms that during his time in office PCSSD, the poorer district, consistently sought consolidation. It was LRSD that opposed it, and not for racial reasons, either, but simply because it did not want to take on the additional financial responsibility of educating PCSSD's students. Tr. 1131–32 (testimony of Mr. Parsons, called by LRSD).[5] It is true, therefore, that no deannexations have taken place since 1968, but to blame this on PCSSD's desire not to increase its black student percentage is not plausible.

3. In many other respects, however, PCSSD has fallen short of its constitutional obligations, or at least the District Court has not clearly erred in so finding. It cooperated with LRSD and the State in transferring to LRSD the racially segregated Granite Mountain housing project (to be discussed in more detail later). It is imposing upon black students an unfair proportion of the burden of busing for purposes of desegregation, it is not meeting its goals for the hiring of black teachers, it is assigning black students disproportionately to the classification of educably mentally retarded, and it has failed to comply with requirements in the *Zinnamon* decree that a Bi-Racial Committee be established and that two black citizens serve as ex officio members of the school board. And, perhaps most important for present purposes, PCSSD has, in violation of the *Zinnamon* decree, located new schools in white neighborhoods or in places inconvenient to black students, and maintained a number of schools whose racial makeup falls outside the limits specified by the decree. These factors, especially the school-siting decisions, naturally affect the movement of

60, 34 black and 363 white. Tr. 133–34 (LRSD's witness).

5. Mr. Parsons also testified that he knew of no movement of white students from LRSD to PCSSD. Tr. 1142.

students and families. PCSSD has thus violated not only the *Zinnamon* decree but also the Supreme Court's direction in the *Swann* case, 402 U.S. at 20–21, 91 S.Ct. at 1278–79, that new schools not be located "in the areas of white suburban expansion, farthest from Negro population centers."

I believe these factors are having a substantial current interdistrict effect. The record contains expert testimony, and it is not implausible, that these constitutional violations, considered together, are making PCSSD "whiter" and LRSD "blacker" than they otherwise would have been. I have indicated why I do not believe that PCSSD's violations have actually caused any substantial degree of white movement from LRSD to PCSSD, or of black movement out of PCSSD. But another kind of movement—that of families coming from outside the entire Pulaski County area— has, I believe, been substantially influenced. (This sort of movement was referred to by one of the experts as "white overflight.") The pro-white emanations that PCSSD has given off over a period of years, if I may use such a metaphor, have, it seems, been a substantial factor attracting white parents, especially since those parents could, as the lines are now drawn, move into PCSSD without being outside the City of Little Rock. The boundary change ordered by the Court (making LRSD and the City coterminous) would make LRSD 60% black and 40% white, *ante* at 419, instead of 70% black and 30% white. This 10% change seems a fair approximation of what the racial percentages would have been absent the influence of PCSSD's violations. I therefore concur in the Court's decision to adjust the LRSD– PCSSD boundary line to this extent.

### B.

The Court holds that the State of Arkansas has committed constitutional violations that are producing substantial interdistrict effects. It therefore awards interdistrict relief against the State, in the person of the State Board of Education. I quite agree that the State of Arkansas has been, in this field, a persistent violator of constitutional rights. I cannot agree that these violations (with one exception) are responsible for the racial disparity now existing between PCSSD and LRSD, or that they justify (again with an exception) interdistrict relief against the State.

1. The Court recounts in detail the manifold sins and omissions of the State of Arkansas in this field. There is no point in denying the history set out in the Court's opinion. In particular, for many years the State, although professing adherence to the "separate but equal" doctrine that was then the law of the land, in fact maintained schools that were separate and unequal, and the black people of the State bore the brunt of this inequality. Furthermore, from 1954 on, the Executive and Legislative Branches of State government set their faces like a flint against the law, covering themselves and the State with dishonor.[6] But what is the present legal relevance of these facts? To the extent that any individual school district (including the three in Pulaski County) is not fully desegregated, the State is at least partly responsible and should pay the price. It has been 31 years since *Brown* was decided, but centuries of inequality are not so soon dissipated. There is no showing whatever, however, and no claim, that the State has caused any school-district boundary lines to be drawn or maintained for racial reasons. Much of the history that the Court details, therefore, is simply irrelevant to the question of interdistrict relief in the present case.

2. The point is made that the State Board of Education is, by statute, given extensive powers, including general supervision over all public schools in the state, Ark.Stat.Ann. § 80–113, and the approval of plans and expenditures of public-school

---

**6.** On the other hand, the whole picture, fairly considered, is not so gloomy as the Court implies. Plaintiff's own expert witness on the history of school desegregation in Pulaski County testified that "Little Rock a few years after 1959 was far more integrated … than many cities in the North where I grew up." Tr. 103.

funds for new school buildings, Ark.Stat. Ann. §§ 80–113, 80–3506. These statutes have never been interpreted to give the State Board of Education the sort of wide-ranging supervisory power this Court attributes to it. Instead, local school boards, except for certain legal and financial aspects of their operations, have been almost completely autonomous. See Ark.Stat. Ann. § 80–509, listing in comprehensive detail the powers of local boards. Decisions, for example, as to where to locate schools have always been treated as the prerogative of local boards. They have chosen the sites, Tr. 776, and the State Board of Education has never claimed the authority to overrule a district's decision on where to build a school, Tr. 788. Rather, the statement in § 80–113 that the State Board shall "approve plans and expenditures of public school funds for all new school buildings" has been interpreted to authorize the State Board to review local decisions only to make sure that plans meet recognized construction standards and that proposed methods of financing are legally and fiscally sound under the statutes of the State limiting school districts' bonded debt. Tr. 775. Both the State Board and local school districts have so construed the statute at least since 1931. There is no evidence that the State Board has ever purported to review school-siting decisions, either for desegregation or for any other purposes. It is therefore unfair to blame the State for PCSSD's violations of the siting provisions of the *Zinnamon* decree.

It is true, as the Court says, that the State Board of Education's efforts to assist and encourage desegregation have been too little and too late (though I suspect that it is entitled to somewhat more credit than the Court gives it).[7] But again, what is the relevance of this fact to the specific interdistrict relief contended for in the present case? If the State Board of Education had diligently fulfilled its duty to encourage desegregation, would the boundary line between LRSD and PCSSD be located in a different place from where it now is? Would the racial distribution of students between those two districts be different from what it now is? I do not believe that the record supports any definite answer to these questions. I repeat that the State's defaults would fully justify compelling it to participate in an *intra*district remedy. But that is not what this case, at least primarily, is about.

3. There are certain specific respects, however, in which the State of Arkansas, with a racially discriminatory motive, actually assisted in the movement of school children across district lines. During the school year 1958–59, the schools in LRSD were closed, and many children from Little Rock attended segregated schools in PCSSD. The State paid at least part of the cost of these transfers, and I am willing to assume that many more white students than black benefited from this action. Shameful as it was, I cannot see that this episode has any continuing, current effect on the distribution of students as between LRSD and PCSSD. The LRSD schools reopened in the fall of 1959, and there is no evidence that students who attended school elsewhere in 1958–59 did not return to LRSD when they could. I would, however, on the basis of this history, agree that the State should pay for any voluntary majority-to-minority transfers between PCSSD and LRSD. That would be a fair recompense for what it did in the late fifties.

The Court suggests that the racial turmoil created by the State in LRSD in 1957 and the years immediately following has increased the percentage of black students in the district. It says, for example, that

7. In 1966, for example, the State Board did create a specific position to work with local boards in the desegregation process. This position was paid for out of the State's own funds, not federal funds. Tr. 784–785. The State did not apply for federal desegregation funds. Instead, the Arkansas Technical Assistance Center, a private organization sponsored by Ouachita Baptist University, applied for and received Title V federal funds to assist school districts in desegregating. "The decision was made ... that those funds could be expended probably more efficiently if it were in any agency ... that was not subject to politics and pressures." Tr. 804. The State Board of Education "cooperated very closely with the Center at Ouachita." Tr. 805.

"the active intervention of the state was a central factor in delaying desegregation of the Little Rock schools until 1973, and in contributing to the increasing concentration of blacks in LRSD." *Ante* at 417. With the first part of this statement I can agree completely, but the second part seems to me a *non sequitur.* The idea that "state-created racial turmoil in LRSD in the 1950's fostered substantial white flight from LRSD to PCSSD and NLRSD," *ante* at 417 n. 8, seems completely counterintuitive. It would be much more plausible to infer that the State's efforts to maintain segregation in LRSD made it more likely for whites, once the schools had been reopened, to remain there. Even were it correct that pro-segregation turmoil of the late 1950's somehow fostered white flight, this phenomenon ended long before the 1973 implementation of desegregation and could at most account for the increase in the percentage of black students to 48%, which was the black percentage in LRSD in 1973. See *Clark v. Board of Educ. of the Little Rock School District,* 705 F.2d 265, 267 (8th Cir.1983).

4. In one other respect, however, I believe the Court properly attributes interdistrict liability to the State. Housing authorities are creatures of the State, existing by virtue of statute, and the Little Rock Housing Authority clearly maintained and fostered racial segregation. In some cases, it might be unfair to award interdistrict relief against school districts on the basis of housing violations. A "school case, like a vehicle, can carry only a limited amount of baggage. *Swann,* 402 U.S. at 24 [91 S.Ct. at 1280]." *Bradley v. School Board of the City of Richmond, Virginia,* 462 F.2d 1058, 1066 (4th Cir.1972), *aff'd by an equally divided Court,* 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973). But here, PCSSD, LRSD, and the State legislature all cooperated with the Little Rock Housing Authority in respect of the Granite Mountain Housing Project, a segregated black project constructed in 1953. At that time, territory in which the housing project was to be located was transferred by a special act of the General Assembly from PCSSD to LRSD. The school districts and the State were thus directly involved in a transfer of territory on which a segregated housing project was to be built, a fact that they must have known.

This was a clear interdistrict violation, and an appropriate remedy should be devised to cure it. The Court, *ante* at 435, directs that the Granite Mountain area be retransferred to PCSSD, and leaves to the District Court on remand to determine "the precise boundaries of . . . the area that was impacted by the 1953 deannexation of land from PCSSD to LRSD." *Ibid.* I agree that this remedy, or some substantial equivalent to be selected by the District Court, see *ibid.,* is appropriate.

### III.

In sum, this Court properly affirms, as not clearly erroneous, the District Court's findings of intradistrict violations on the part of PCSSD. These violations, as well as those committed by NLRSD, should be corrected. In the main, intradistrict relief, in which the State Board of Education should be made to share, should be adequate for this purpose. I also believe that an interdistrict violation by PCSSD, LRSD, and the State has been made out in respect of the location of the Granite Mountain Housing Project, and that PCSSD's other violations justify the boundary change ordered by the Court. As to the State Board of Education, however, I would not grant any interdistrict relief, except with respect to the funding of voluntary student transfers and the retransfer of the Granite Mountain area. From the extensive additional relief granted against the State, and from the remaining remedial details ordered by this Court, I respectfully dissent.

JOHN R. GIBSON, Circuit Judge, concurring in part and dissenting in part, joined by FAGG, Circuit Judge.

Although I agree with much of what the court does today, I do not believe there is sufficient evidence in the record to support that part of the court's decision requiring

that the boundary lines of the City of Little Rock and the LRSD be made coterminous. Therefore, I respectfully dissent. Furthermore, while I agree with nearly all of Judge Arnold's persuasive discussion and reasoning, I believe that his opinion likewise fails to demonstrate that there has been sufficient proof of significant interdistrict segregative effects to justify realigning the boundaries of the LRSD and the City of Little Rock.

The record makes plain, and I fully concur in the court's conclusion, that there have been substantial and in fact egregious intradistrict constitutional violations as a result of segregative acts on the part of the NLRSD and the PCSSD, the effects of which must be remedied. I also agree with the court's conclusion that the record does not reveal sufficient interdistrict segregative effects to justify consolidation of the three districts.

I further agree with the court today that the Granite Mountain transfer, which occurred in 1953, had an interdistrict segregative effect. However, I believe that the current effects of this violation are not clearly delineated either in the district court's findings of fact and conclusions of law, or in this court's conclusions today. Contrary to the court's decision today, as well as Judge Arnold's views, I believe that this issue should be remanded to the district court for more precise and specific findings as to the current interdistrict segregative effect of the 1953 transfer, and for consideration of an appropriate remedy tailored to the constitutional violation that is found to exist.

My chief concern with the opinion of the court is that it reads too broadly the principles which govern the federal equitable remedial power in *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*). Judge Arnold, while recognizing these principles and cogently pointing out the manner in which the court misapplied them, improperly relies upon his own factual conclusions based on an overly generous interpretation of the record to justify the remedy ordered today.

*Milliken I* established that an interdistrict remedy is appropriate only upon a showing of "a constitutional violation within one district that produces a significant segregative effect in another district;" specifically, that "racially discriminatory acts * * * have been a substantial cause of interdistrict segregation." *Id.* at 744–45, 94 S.Ct. at 3127. Further, an interdistrict remedy is appropriate only "to eliminate the interdistrict segregation *directly* caused by the constitutional violation." *Id.* at 745, 94 S.Ct. at 3127 (emphasis added). Two courts of appeals have read this language to require clear proof of cause and effect of a constitutional violation and a careful delineation of the extent of the effect before an interdistrict remedy may be involved. In *Lee v. Lee County Board of Education,* 639 F.2d 1243, 1256 (5th Cir.1981), the court stated:

> We believe the Court's deliberate choice of phrases such as "substantial" or "direct cause" and "significant segregative effect" also expresses an insistence that in cases where an interdistrict remedy is requested, there must be clear proof of cause and effect and a careful delineation of the extent of the effect. In the absence of such a showing, school district lines are to be carefully observed and desegregation remedies confined to orders affecting the school district in which the condition of segregation is manifest.

*Accord Goldsboro City Board of Education v. Wayne County Board of Education,* 745 F.2d 324, 332 (4th Cir.1984).

The Fifth Circuit also emphasized in *Lee* that there must be "a substantial, direct and *current* segregative effect," 639 F.2d at 1260 (emphasis in original), before an interdistrict remedy may be ordered. This argument is persuasive, for a remedy cannot be tailored to correct a condition, *Milliken I,* 418 U.S. at 738, 94 S.Ct. at 3124, unless it currently offends the Constitution. As the court stated in *Milliken I:* "A federal remedial power may be exercised 'only on the basis of a constitutional violation' and, '[a]s with any equity case, the

nature of the violation determines the scope of the remedy.' " *Id.* at 738, 94 S.Ct. at 3124 (quoting *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971)). The Court reemphasized this important limitation on the federal remedial power in *General Building Contractors v. Pennsylvania,* 458 U.S. 375, 399, 102 S.Ct. 3141, 3154, 73 L.Ed.2d 835 (1982), in which it cautioned that a remedial decree should "extend no farther than required by the nature and the extent of that violation."

It is also well to observe before we turn to specific issues that the court today adopts its own remedy, which has not been addressed by the parties in their arguments or briefs, and which differs substantially from that ordered by the district court. The findings of fact necessary to support this court's remedy simply do not exist. Specifically, there is no finding by the district court of a current segregative effect to support the conclusion that the boundaries of the City of Little Rock and LRSD be made coterminous.

The court, to support that portion of its discussion mandating that the boundary of the City of Little Rock and the LRSD be coterminous, simply catalogs a portion of the district court's findings in a footnote. *See ante* at 435 n. 20. It must be observed, however, that the court, at least with respect to the district court's findings on student assignments, special education, transportation, and employment of faculty and administrators, simply has enumerated intradistrict violations that may require intradistrict remedies within the PCSSD. Neither this court's nor the district court's opinion indicates in any way that these *intra* district violations manifested an *inter* district effect.

Similarly, neither the opinion of this court nor the record from the district court reveals the conduct of the PCSSD which has resulted in the lack of low income housing in the PCSSD. The only exception with respect to public housing is the evidence concerning the Granite Mountain

deannexation in 1953 and the role that the PCSSD may have played at that time.

The court also relies on violations relating to school sitings to justify an interdistrict remedy. These violations which are discussed at some detail in the court's opinion involve decisions by the PCSSD to build some twelve schools away from the centers of black population. This, it is argued, served to attract whites to the outlying areas, resulting in a number of schools with over 90% white enrollment. This is a weak foundation for the remedy the court today orders. Adjusting the boundaries of the PCSSD and the LRSD so that the latter are coterminous with Little Rock city limits will not affect the twelve schools in question, which are located far from the city limits. There simply is no indication in the record that the suspect school sitings had any impact on the schools within the Little Rock city limits that, as a result of the court's decision today, will now be turned over to the LRSD.

Judge Arnold's opinion treats in detail what interdistrict effects might result from the history of annexations and deannexations. The district court's order stressed the freezing of the boundaries. The court today emphasizes testimony that "the boundaries harden[ed]," *ante* at 419, and were "maintained to keep the LRSD predominantly black and the PCSSD predominantly white," and concludes that these manipulations had a substantial interdistrict segregative effect. Admittedly there was expert testimony to support this conclusion. The court relies heavily on Dr. Dentler's testimony that beginning in 1968 the board of PCSSD refused to modify its boundaries. *Ante* at 420. To the contrary, the United States argued that PCSSD has not refused a single deannexation petition since it allegedly froze its boundaries. In its brief, LRSD attempts to refute this argument and support the theory that the PCSSD intentionally froze its boundaries:

> The record reveals, however, on 4/13/65 the PCSSD notified the adjacent Bryant and Cabot school districts that it would

not accept any more black students. PX 10. The minutes further reveal the county refused to meet with LRSD officials to discuss consolidation on 5/14/68, and refused NLRSD's attempt to annex the Spring Hill area on 4/8/69. Further, informal efforts of the LRSD to discuss cooperative interdistrict agreements failed.

Brief for Appellee at 56.

After argument, this court specifically inquired as to the record support for these statements. LRSD answered that the first sentence had no record support. As to the second sentence, it answered that the PCSSD board had, on May 14, 1968, voted in favor of consolidation with LRSD.[1] On this critical point, therefore, LRSD simply was forced to admit that its argument had collapsed. This collapse not only removes the factual underpinnings from Dr. Dentler's opinion, but makes it directly contrary to the evidence. Judge Arnold is correct in his conclusion that "it is true * * * that no deannexations have taken place since 1968, but to blame this on PCSSD's desire not to increase its black student percentage is not plausible." *Ante* at 440. On the record before us, I can only conclude that the district court's finding that the PCSSD intentionally "froze" or "hardened" its boundaries, which the court today accepts, is contrary to the evidence, and thus is clearly erroneous.

The only other support for the court's order today is "the pre- and post-*Brown* interdistrict transfers and the other historical violations with continuing effect." *Ante* at 435 n. 20. Absent a more specific demonstration of the continuing effects of historical violations, *see ante* at 436 (Arnold, J., concurring and dissenting), I believe that this evidentiary foundation, as well as the entire stated basis for the court's remedy, fails to meet the standards of *Milliken I* and the clarifying interpretation of those standards in *Lee* and *Goldsboro*.

To Judge Arnold's credit, he squarely faces the weaknesses of the court's opinion. His further observations on the support for making the boundaries of LRSD and the City of Little Rock coterminous deserve further comment.

From the decisions of the PCSSD locating schools in areas of white suburban expansion farthest from black population centers, Judge Arnold argues "I believe these factors are having a substantial current interdistrict effect." *Ante* at 441. He argues that the movement of families from outside the entire Pulaski County area to areas within the City of Little Rock also within the PCSSD has been substantially influenced by the unconstitutional siting decisions, causing a phenomenon labeled "white overflight." It must be observed that Judge Arnold does not point to any "substantial evidence" proving this "significant segregative effect," *Milliken I,* 418 U.S. at 744–45, 94 S.Ct. at 3127, or as expressed in *Lee,* "clear proof of cause and effect and a careful delineation of the extent of the effect." 639 F.2d at 1256. Rather, he relies upon belief. Such beliefs do not, within the limitations of our judicial power, serve as an appropriate consideration in reviewing the order before us. Judge Arnold makes no effort to determine whether there are findings of the district court which support these conclusions. There simply are none. The imprecise nature of his conclusions and his departure from the principles of *Milliken,* are best evidenced by his conclusion that the ten percent change in racial makeup which results from realigning the LRSD's boundaries "seems a fair approximation of what the racial percentages would have been absent the influence of PCSSD's violations." *Ante* at 441. Thus, his vigorous effort to support the court's conclusion ultimately rests on speculation, belief, and fair approximation, and not upon the principles of *Milliken I* which must guide us.

---

**1.** The informal efforts referred to in the last sentence occurred in a later period, shortly before the filing of this action.

Judge Arnold's final observation conclusively demonstrates the tenuous nature of his conclusion. He points to "pro-white emanations" that PCSSD has given off over a period of years as a factor which has attracted white parents into the PCSSD areas within the City of Little Rock. There is no indication as to the record source of these emanations. I have substantial question whether such subjectively perceived emanations are sufficiently palpable to make the showing required by *Milliken I* or to constitute the clear proof of cause and effect which *Lee* and *Goldsboro* correctly hold to be necessary.

Judge Arnold's particular approach to these issues must rely upon his own findings. This is contrary to the Supreme Court's teaching in *Anderson v. City of Bessemer City*, — U.S. —, 105 S.Ct. 1504, 1510–11, 84 L.Ed.2d 518 (1985), that the trial judge must play the principal role in the determination of facts.

A final observation is in order. The court stretches mightily to find a basis for making the boundaries of the City of Little Rock and the LRSD coterminous. This result will make the LRSD 60 percent black and 40 percent white. However, one most significant factor has been omitted from this equation. In 1980 there were 3,632 white students enrolled in private schools located in the LRSD, 2,794 white students enrolled in private schools in PCSSD, and 1,086 white students enrolled in private schools in the NLRSD. In the LRSD alone, if the white students in private schools attended public schools, the district would be approximately 52 percent rather than 69 percent black. Another significant factor which is not taken into account is

that the number of white students in private schools in LRSD increased by more than 1,000 between 1970 and 1980 and the number of white students in private schools in PCSSD increased by more than 1,700 during the same time period. It is evident from the sharp increase in enrollment in private schools in these ten years, and the impact of these numbers on the total student population, that private choice is having a far greater segregative effect than those factors the court points to in its opinion today.[2] This is a factor, however, that at present, and in all likelihood in the future, will pose a significant impediment to any effort to achieve desegregation within any of the three school districts.

One of the great failings of the court's opinion, as well as that of the district court order, is the failure to address in other than a most speculative way demographic factors, such as population movement and birth rate, common to major metropolitan centers, that have significant impact on the school problems in this and other communities. *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 436, 96 S.Ct. 2697, 2704, 49 L.Ed.2d 599 (1976); *see also Bradley v. School Board of City of Richmond*, 462 F.2d 1058, 1066 (4th Cir.1972), *aff'd mem. by an equally divided court*, 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973).

I would remand the case to the district court only for further consideration of appropriate relief for intradistrict constitutional violations and for further consideration of the current segregative effect resulting from the Granite Mountain deannexation and for consideration of an appropri-

---

2. The private school problem seems to be an untouchable issue that none of the parties has evidenced any interest in addressing. It may well be that a substantial portion of the enrollment is in religious and parochial schools. From figures furnished to the court by the parties based upon publications of the state of Arkansas, however, there are nearly 3,000 students in the Little Rock area who attend private schools seemingly having no religious affiliation. There simply is no record before us to determine whether some of this enrollment is

pretext for avoiding the impact of desegregation or springs from other motives. We do observe, however, that racial discrimination in private schools, including those with a religious affiliation, is deeply contrary to public policy, *Bob Jones University v. United States*, 461 U.S. 574, 595 & n. 32, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), and that schools which are shown to employ discriminatory practices will be barred from enjoying the governmental privileges accorded their nondiscriminatory counterparts. *Id.* at 595–96, 103 S.Ct. at 2030–31.

ate remedy tailored to correct any such violation.

BOWMAN, Circuit Judge, concurring in part and dissenting in part.

I agree with the views expressed in the separate opinion of Judge John R. Gibson, with two reservations.

First, I do not agree that the Granite Mountain transfer provides a proper basis for an interdistrict remedy. This transfer occurred in 1953, when all public facilities in Arkansas, public schools and public housing alike, still were operating, with the law's blessing, on a segregated basis. The black children living at that time in the Granite Mountain housing project would have gone to all-black schools no matter which district those schools happened to be in. Because it seems clear that the maintenance of segregated education was not the motive for this transfer, I would not treat it as a predicate for interdistrict relief.

Second, I do not agree with the thrust of footnote 2 of Judge Gibson's opinion, *ante* at 447. Specifically, I do not agree that lawfully operated private schools are an "issue" that any of the parties to this lawsuit should have an interest in addressing. Parents choose their children's schools for many different reasons. Sometimes the reasons are admirable, sometimes not. So long as this remains a free country, however, the motives of individual parents in opting to send their children to private school rather than public school will remain none of the law's concern.